**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX)<br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>Defendant-Intervenors. | ) | Court No. 26-02435 |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2 BY PLAINTIFF SOC TRANG SEAFOOD COMPANY LIMITED (STAPIMEX)


John J. Kenkel
International Trade Law
Counselors, PLLC
8647 Richmond Hwy.
Suite 623
Alexandria, Va. 22309
*Counsel to Soc Trang Seafood Joint Stock Company (STAPIMEX)*


Dated: August 14, 2026

## TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………………………..1

II. STATEMENT PURSUANT TO RULE 56.2(c) ………………………………………..1

A. The Administrative Determination under Review ………………………………..1

B. Issue of Law Presented ……………………………………………………………..2.

C. Summary of Arguments ……………………………………………………………2.

1. Customs Brokerage. ……………………………………………………………2

2. Control Number Specific and Product Code Information Reported……………3

3. Commerce Errors in Preliminary Results Calculations…………………………6

III. STATEMENT OF FACTS RELEVANT TO THE ISSUES ………………………………..6

IV. STANDARD OF REVIEW……………………………………………………………….6

V. ARGUMENT………………………………………………………………………..…..12

A. STAPIMEX admits that it unintentionally did not provide the field DMEBROKU (U.S. Customs brokerage) in its Supplemental Section C response database. Nevertheless, once Commerce issued its Preliminary Results, noting that DMEBROKU was missing, STAPIMEX quickly requested permission to file a revised Section C database and then did file that database, containing the missing DMEBROKU, with sufficient time for Commerce to consider it. ……………….…..12

1. Facts ………………………………………………………………………………13

a. STAPIMEX's Submissions…………………………………………………13

2. LEGAL ARGUMENT REGARDING DMEBROKU……………………………19

a. The Federal Circuit has ruled that Commerce must correct errors committed by respondents in certain circumstances………………………………………..20

b. Commerce abused its discretion……………………………………………………20

c. Commerce cannot determine punitive dumping margins…………………..21

d.
**d. STAPIMEX's submission of June 20, 2025, did not contain multiple instances of new data compared to its supplemental Section C response dated May 14, 2025, which Commerce used in the preliminary results……………………………………………22**

**B. STAPIMEX ANSWERED THE INITIAL QUESTIONNAIRE PRECISELY REGARDING (1) REPORTING OF CONTROL NUMBERS (CONNUMS) AND (2) PRODUCT CODES. THEREFORE, EACH LINE ITEM IN THE SECTION C AND D DATABASES CONTAINED CONNUM-SPECIFIC INFORMATION. FURTHER, COMMERCE NEVER ASKED ANY SPECIFIC QUESTIONS ABOUT CONNUM-SPECIFICTY IN SUPPLEMENTAL QUESTIONNAIRES…………………………24**

**1. FACTS…………………………………………………………………………….25**

**a. STAPIMEX fully complied with all instructions in the initial questionnaire (IQR) regarding the submission of product codes and control numbers. Contrary to the Department's claims, there were no subsequent questions regarding this issue in any supplemental questionnaires……………….25**

**b. Commerce's supplemental questionnaires contained zero questions regarding the submission of product codes and connums………………30**

**c. Contrary to Commerce's opinion, STAPIMEX did not manipulate its product code or connum data in its Section C database…………………31**

**d. Commerce has not adequately addressed its complete failure to cure the "WARNING" error its SAS computer program issued………………..31**

**2. LEGAL ARGUMENT REGARDING CONNUM-SPECIFICTY………………32**

**A. Commerce's rationale for cancelling verification, in part, due to its perception that STAPIMEX incorrectly reported product codes and connums, calling the Section C response unverifiable, is without merit…………………………33**

**i. Commerce did not utilize substantial evidence on the record to determine that STAPIMEX's information was so flawed that it could not be verified………………………………………………………….….34**

**ii. Commerce abused its discretion in finding that STAPIMEX did not act to the best of its ability in reporting connums and prodcodes……………………..35**

**iii. Commerce was arbitrary and capricious in its decision…………….35**

**iv. There exists no missing or erroneous information regarding product codes**

**and/or control numbers (connums)…………………………………………..36**

**v. The use of total adverse facts available is not predicated on substantial evidence and is otherwise contrary to law…………………………….37**

**C. COMMERCE MADE ERRORS IN ITS CALCULATIONS IN THE PRELIMINARY RESULTS. THEY SHOULD BE CORRECTED IN THE FINAL RESULTS………………………………………………………………………….39**

**a. FACTS……………………………………………………………………..39**

**1. Incorrect Raw Material (RM) Surrogate Value applied to <u>fresh</u> raw shrimp……………………………………………………………………39**

**2. Commerce erred in computing the larvae input cost……………………40**

**3. Commerce erred in computing <u>frozen</u> shrimp input cost………………40**

**b. <u>LEGAL ARGUMENT</u>……………………………………………………..40**

**1. Commerce is required to correct its mistakes: both those based on a lack of substantial evidence on the record, as well as any mistakes found in its computer programs…………………………………………………………40**

**VI. <u>CONCLUSION AND RELIEF REQUESTED</u>……………………………………………43**

TABLE OF AUTHORITIES

**CASES**

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd., 334 F.3d 1284, 1292 (Fed. Cir. 2003)*............................................................................................................................

*Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed. Cir. 1984) .................................

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)…………………………………………………….

*Brother Industries, Inc. v. United States, 15 C.I.T. 332, 771 F. Supp. 374, 384* (Ct. Int'l Trade 1991)…………………………………………………………………………………..

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, (Fed. Cir. 2012) …………………………………………………………………………

*Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-1104 (Fed. Cir. 1990)*. ………

*Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367 U.S. 316, 321, (1961)*………………….

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)..................................

*Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) ..................................…..

*Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006)…………….

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)*………………………………………………………………………………..

*Gerald Metals Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)………….................

*Goodluck India Ltd. v. United States, 11 F.4th 1335, 1342-44 (Fed. Cir. 2021)*………………………

*Halo Electronics, Inc. v. Pulse Electronics, Inc., 579 U.S. 93, 103, 136 S. Ct. 1923, (2016)*…………………………………………………………………………………………………….

*Hyundai Heavy Indus. Co. v United States*, 393 F. Supp. 3d 1293, 1311 (Ct. Intl Trade, 2019)………………………………………………………………………………………….

*Judulang v. Holder, 565 U.S. 42, 53, 132 S. Ct. 476, 181 L. Ed. 2d 449*

*(2011)*)……………..…………………………………………………………………….

*Koyo Seiko Co. v. United States, 746 F. Supp. 1108, 1111,* ( Ct. Intl. Trade 1990)……….

*Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009)……………..*

*Mueller Comercial De Mexico v. United States,* 753 F.3d 1227, 1233 (Fed. Circ. 2014)..

*Novosteel SA v. United States,* 284 F.3d 1261, 1276 (Fed. Cir. 2002)……………………

*NTN Bearing Corp. v. United States,* 74 F.3d 1204 (Fed. Circ., 1995)……………………

*Rhone Poulenc* v. United States*, 899 F.2d 1185, 1191* (Fed. Cir. 1990)………………….

*RHP Bearings v. United States*, 19 C.I.T. 1389 *; 1995 Ct. Intl. Trade LEXIS 246 **; 17 Int'l Trade Rep. (BNA) 2460; SLIP OP. 95-194, (Ct. Intl. Trade, 1995)……………..

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001)…………………………………………………………………….

*SKF USA. Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). …………………..

*Skidmore v. Swift & Co*., 323 U.S. 134 (144)………………………………………….…

*SolarWorld Americas, Inc. v. United States*, 962 F.3d. 1351 (Fed. Cir. 2020)………………

*Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 995. (Ct. Intl. Trade, 1992)………

*Tehnoimportexport v. United States, 15 C.I.T. 250, 766 F. Supp. 1169, 1178* (Ct. Int'l Trade 1991)……………………………………………………………………………. ……..

*Thai Pineapple Canning Indus. Corp. v. United States*, 273, F.3d 1077, 1085 (Fed. Cir. 2001)………………………………………………………………………….

*Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006)*…………………..

*Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004).....................…..

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)............................................…..

*USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).......................……

*Weyerhaeuser Co. v. United States Fish & Wildlife Service*, 586 U.S. 9, 25, 139 S. Ct. 361, 202 L. Ed. 2d 269…………………………………………………………………………...

**STATUTES and REGULATIONS**

*5 U.S.C. § 706* (2)(A)

19 U.S.C. §1516a(b).

19 U.S.C. § 1516a (a)(2)(B)(iii)

19 U.S.C. § 1516a(b)(1)(B

)19 U.S.C. § 1671-1671(f)

19 U.S.C. § 1673d(c)(5)

19 U.S.C. § 1677e(a)

19 U.S.C. § 1677e(b)

.19 U.S.C. §§ 1677m(d)

19 U.S.C. § 3512(d)

*19 C.F.R. § 351.224(b)*,

Statement of Administrative Action, H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 ***U***.***S***.***C***.C.A.N. at 4198-99

**ADMINISTRATIVE DECISIONS**

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results, Notice of Intent To Rescind, in Part, and Final Rescission, in Part, of Antidumping Duty Administrative Reviews; 2023-2024, 90* Fed. Reg. 24583 (June 11, 2025)

## I. INTRODUCTION

The U.S. Department of Commerce failed to use substantial evidence on the record in its finding that Soc Trang Seafood Joint Stock Company (STAPIMEX) failed to use its best efforts to report (1) U.S. customs brokerage paid in a market-economy currency (field DMEBROKU), and (to report the control numbers/product codes as requested by the Department in a connum-specific manner. The Department's use of total adverse facts available ("AFA") not only was not predicated on substantial evidence but was an abuse of discretion, arbitrary and capricious, and otherwise not in accordance with law.

Should the case be remanded to Commerce, if there is a need for gap-filling information, that data is already on the record in several exhibits submitted to Commerce regarding DMEBROKU.

Finally, Commerce committed certain errors in the preliminary results that should be corrected so the dumping margin may be calculated as accurately as possible.

## II. STATEMENT PURSUANT TO RULE 56.2(c)

### A. The Administrative Determination under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest the Commerce Department's ("Commerce," or "the Department," or "DOC") Final affirmative antidumping duty final results regarding its administrative review of certain frozen warmwater shrimp from the Socialist Republic of Vietnam. *See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review: 2023-2024,* (91 Fed. Reg. 8429) issued February 17, 2025, and published on February 23, 2026, P.R. 9 (published), and accompanying Issues and Decision Memorandum ("IDM") (February 17, 2026) ("*Final*

*Results*”) P.R. 10. “P.R.” refers to the Department’s public record; “C.R.” refers to the confidential record). Commerce determined a rate of 25.76 percent.

**B. Issue of Law Presented**

There are three issues presented: (1) whether the Department’s appropriately used total adverse facts available (“AFA”) in lieu of the revised Section C database, containing the missing field DMEBOKU (U.S. customs brokerage). Alternatively, if Commerce properly rejected the revised database, should it have used neutral facts available contained in numerous exhibits to fill any gaps regarding U.S. customs brokerage; (2) whether Commerce correctly used total AFA regarding the reporting of control numbers (“connums:) in a connum-specific manner and product codes in its Section C and D databases; and (3) certain clerical errors made by Commerce in the preliminary results should be corrected so a dumping margin may be calculated that is as accurate as possible.

STAPIMEX argues that Commerce’s methodology was not predicated on substantial evidence on the record, an abuse of discretion, arbitrary and capricious, and not otherwise in accordance with law.

**C. Summary of Arguments**

**1. Customs Brokerage.**

Regarding U.S. Customs Brokerage, STAPIMEX inadvertently did not include customs brokerage, DMEBROKU, in its initial questionnaire response, although its narrative stated that it did. This held true for its response to the supplemental Section C questionnaire response as well. In that supplemental Section C response, however, STAPIMEX did provide numerous exhibits which contained U.S. customs broker invoices that contained “customs brokers” charges in them; this information could have been used as neutral facts available to fill in any gaps in the administrative record.

Because STAPIMEX submitted a corrected Section C database only days after Commerce published its final results, the courts have found that this is sufficient for Commerce to include the new data in its final results.

Additionally, the non-use of such gap-filling information not only is not predicated on substantial information on the record but is an abuse of discretion because the facts available used by Commerce, the highest expense in the Section C database ($0.76 per pound) (this information was previously classified by STAPIMEX as business proprietary information but now STAPIMEX is releasing it as public information) is certainly punitive when compared to the actual customs brokerage contained in the numerous customs broker invoices (as low as $0.0025 per pound), again now reclassified by STAPIMEX as public information. This is clearly punitive.

As a result, Commerce's use of total AFA regarding DMEBROKU information reported by STAPIMEX is not based on substantial evidence on the record, and abuse of discretion, and otherwise not in accordance with law.

**2. Control Number Specific and Product Code Information Reported.**

Regarding the reporting of control numbers in a connum-specific manner, as well as product codes, STAPIMEX completely followed the instructions in the initial questionnaire. Each line item of sales in the Section C response and each line items of the factors of production data in the Section D response contains the control number (connumu) and product code (prodcodu), as specifically requested by Commerce in its initial questionnaire.

Indeed, Exhibit C-7 in STAPIMEX's initial questionnaire response ("CIQR") contains a roadmap showing (1) each control number, (2) product description, and (3) product code combination. This is raw data, not manipulated data as suggested by Commerce. Thus, Commerce was on notice that some connums had more than one product code associated with

them from the first response submitted by STAPIMEX. This reporting by STAPIMEX was performed exactly as Commerce requested – no more, no less. Indeed, Commerce never issued a supplemental question to STAPIMEX regarding its reporting either of the connum or prodcodu. For example, if Commerce had disagreed with the manner in which STAPIMEX reported its connums and product codes, as evidenced in its Exhibit C-7, Commerce should have asked a first time for STAPIMEX either to explain this Exhibit or change its methodology. Commerce never asked a first time, much less a second time. Thus, Commerce did not meet its burden under 19 U.S.C. § 1677m(d).

Indeed, it is Commerce's SAS computer program used to calculate the dumping margin in the preliminary results that is at issue. It did not include all U.S. sales in its computation of a preliminary dumping margin. Only because STAPIMEX sent a letter to Commerce after issuance of the preliminary results, notifying it of the "WARNING" message it received (and apparently ignored), did Commerce learn of its error. However, Commerce chose to blame STAPIMEX instead for somehow misreporting its connum data, even though each line in both the Section C and D databases has a connum-specific number listed.

Only in its final results Issues and Decision Memorandum ("IDM") did Commerce argue that the "connum-specific" basis reported was not correct. Nowhere prior to the final results did Commerce ask STAPIMEX a first time, much less a second time, to report its connums on any other basis than that specifically shown in Exhibit C-7, reported in the CIQR.

The statute, and the courts, require Commerce to ask a question a second time prior to using total adverse facts available ("AFA"). Here, Commerce did not meet its burden. See 19 U.S.C. § 1677m(d).

As a result, Commerce's use of total AFA regarding the connum-specific information reported by STAPIMEX is not based on substantial evidence on the record and otherwise

not in accordance with law. To wit, Commerce's decision was not fair and balanced. Thus, it was arbitrary and capricious.. as well as an abuse of discretion. Commerce asked no questions, much less a first question regarding STAPIMEX's submitted information regarding connum specificity and product codes.

The third issue regards certain errors Commerce made in calculations for the preliminary results. The methods used by Commerce are not based on substantial evidence. Thus, they were not calculated as accurately as possible.

This, then, leads to a sub-issue if the Court does not agree with STAPIMEX's position regarding submission of the revised Section C database it filed soon after the issuance of the preliminary results: what information should be used for DMEBROKU?

STAPIMEX argues that the "customs brokerage" data reported in four exhibits, concerning six U.S. sales, in the response to the Supplemental Section C Questionnaire, should be used as neutral facts available, to fill in any gaps from the missing field DMEBROKU in the Section C database, since, for example, they show actual DMEBROKU expenses. 19 U.S.C. § 1677e(a). One of those invoices, for example, indicates a customs brokerage cost of approximately $0.0025 per pound. (STAPIMEX is now making all numbers cited herein public information.) This figure is far more accurate than $0.76 per pound (which is more than 300 times higher than $0.0025) used by Commerce as total AFA (and based on the highest expense Commerce found in the Section C database (reported for truck freight from U.S. port to U.S. warehouse).

STAPIMEX understands that the Court may add something to the actual customs brokerage cost because STAPIMEX failed to report DMEBROKU in its Section C database prior to the issuance of the preliminary results.

Moreover, the preliminary results issued by Commerce calculated a dumping margin

of 35.29%, due to the use of $0.76 per pound as total AFA for DMEBROKU. This is approximately 50% higher than the countrywide rate of 25.76%, and results in millions of dollars in excessive, punitive duties – all for an expense, DMEBROKU, that is really on the order of $0.0025 per pound. The courts have consistently observed that excessive, punitive duties are not justified since the primary duty of Commerce in calculating dumping duties is to be as accurate as possible, albeit with some penalty when data is not submitted in the form requested.

3. **Commerce Errors in Preliminary Results Calculations**

Commerce made several errors in its calculations performed for the preliminary results. The courts have held that such errors should be corrected./.

Thus, when the administrative record is viewed in its entirety, STAPIMEX's participation was virtually perfect – only one mistake: when it failed to include a field in its database for DMEBROKU (worth only about $0.0025 per pound) in its response to the supplemental Section C questionnaire.

## III. STATEMENT OF FACTS RELEVANT TO THE ISSUES

The statement of facts relevant to these issues is presented as an introduction to the substantive arguments discussed below.

## IV. STANDARD OF REVIEW.

The courts will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. § 1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. § 1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue."

Under the standard of review established in *Skidmore,* "{t}he weight {accorded to an administrative} judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, at 140.

The courts will uphold a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, the courts have stated that "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [ ] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, the Commerce determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without

taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data. To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")

Commerce is required to objectively evaluate all data on the record. Thus, it must hold its preferences to the same test as it uses to evaluate respondent's proffered data. This analysis must consider the strengths and weaknesses of all the data and then choose the best available information. *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

Moreover, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." *Thai Pineapple Canning Indus.*

*Corp. v. United States*, 273, F.3d 1077, 1085 (Fed. Cir. 2001). Additionally, "to avoid distortions, the Department must consider all relevant factors, including those not present in most antidumping determinations." *Id*.

Further, when substantial evidence is not utilized, such action is tantamount to the use

of speculation to make a determination. . *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

Moreover, the Federal Circuit has held that Commerce cannot use statutory deadlines as an excuse to not calculate dumping margins as accurately as possible. To do so is an abuse of discretion. *See Tehnoimportexport v. United States, 15 C.I.T. 250, 766 F. Supp. 1169, 1178* (Ct. Int'l Trade 1991) (analyzing price regulation which provided for correction of errors in a party's submission if received in time to permit proper analysis and verification**)**. Cited with approval by *NTN Bearing Corp v. United States*, 74 F.3d 1204, 1206-1208 (Fed. Cir. 1995).

*See, also*, *SolarWorld Americas, Inc. v. United States, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020)*. The Administrative Procedures Act ("APA") provides for setting aside an agency decision if, for example, it is "an abuse of discretion," *5 U.S.C. § 706(2)(A)*, and the courts have reviewed decisions for an abuse of discretion, *see Goodluck India Ltd. v. United States, 11 F.4th 1335, 1342-44 (Fed. Cir. 2021*) .

When discretion is granted by Congress, it "should be exercised in light of the considerations underlying the grant of that discretion." *Halo Electronics, Inc. v. Pulse Electronics, Inc., 579 U.S. 93, 103, 136 S. Ct. 1923, 195 L. Ed. 2d 278 (2016)* (internal quotation marks and citation omitted). Discretion is abused if, for example, its exercise rests on "'a clear error of judgment'" in the "'consideration of the relevant factors.'" *Weyerhaeuser Co. v. United States Fish & Wildlife Service, 586 U.S. 9, 25, 139 S. Ct. 361, 202 L. Ed. 2d 269 (2018)* (quoting *Judulang v. Holder, 565 U.S. 42, 53, 132 S. Ct. 476, 181 L. Ed. 2d 449 (2011)*).

Moreover, the statute does not require perfection in a respondent's submissions. The courts also do not agree that draconian penalties are appropriate for the making of clerical errors in order to insure submission of proper data. Clerical errors are by their nature not errors in judgment but merely inadvertencies. While the parties must exercise care in their submissions, it is unreasonable to require perfection. Commerce's refusal to consider NTN's request for correction of clerical errors in its case constituted an abuse of discretion. *NTN* at 1208-1209 (footnote omitted).

In addition, Commerce may not use total adverse facts available as the first resort. The statute limits Commerce's authority to impose total AFA. *See* 19 U.S.C. § 1677m(d).

The statute has certain requirements before Commerce may resort to total AFA. *See* 19 U.S.C. § 1677m(d).

> .(d) Deficient submissions
>
> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—
>
> (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
>
> (2) such response is not submitted within the applicable time limits, then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d) (emphasis added).

Thus,, Commerce must ask a question twice and have it go unanswered prior to finding

a party did not perform to the best of its ability and then use total adverse facts available.

There are instances where using "facts available" are warranted. *See* 19 U.S.C. § 1677e(a). In these instances, where a respondent is cooperative, Commerce must be reasonable and look to the administrative record if neutral facts available are submitted, as a gap-filling means to calculate a dumping margin as accurately as possible. This is in contrast to 19 U.S.C. § 1677e(b) which is reserved for noncooperative parties.. *See, e.g., Mueller Comercial De Mexico v. United States,* 753 F.3d 1227, 1233 (Fed. Circ. 2014) ("We conclude that Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller, as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account as well.") Id. (emphasis added).

Further, Commerce must take greater care in applying 19 U.S.C. § 1677e(a) to a cooperative respondent, as opposed to utilizing 19 U.S.C. § 1677e(b) for a noncooperative respondent. *Mueller,* at 1234, cites with approval other cases which consistently hold that Commerce's power in this regard is limited. ("This result is wholly consistent with our precedents applying *subsection (b)* itself, which is properly directed to non-cooperating parties. This Court's decision in *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)*, required that, even for a non-cooperating party, *subsection (b)* be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." All the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix. Moreover, this Court's decision in *Changzhou* made clear that, in the case of a cooperating party, Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies.)

Further, the Statement of Administrative Action ("SAA") accompanying the URAA is, by statute, "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d); *see Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 n.2 (Fed. Cir. 2005). The SAA provides that the "facts otherwise available" provision is intended to permit Commerce to "fill [] gaps in the record." *See* Statement of Administrative Action, H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 ***U.S.C***.C.A.N. at 4198-99 (explaining that 19 U.S.C. § 1677e(a) "generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes").

Further, it is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA. Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, and that "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (hereafter *Changzhou*) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

## V. ARGUMENT.

### A. STAPIMEX admits that it unintentionally did not provide the field DMEBROKU (U.S. Customs brokerage) in its Supplemental Section C response database. Nevertheless, once Commerce issued its Preliminary Results, noting that DMEBROKU was missing, STAPIMEX quickly

**requested permission to file a revised Section C database and then did file that database, containing the missing DMEBROKU, with sufficient time for Commerce to consider it.**

**1. Facts**

**a. STAPIMEX's Submissions**

Commerce issued the initial questionnaire on July 18, 2024. P.R. 200. Field 20.1 specifically asked about U.S. customs brokerage:

> **FIELD NUMBER 20.1: Market Economy Brokerage and Handling Expenses**
>
> **FIELD NAME: DMEBROKU**
>
> > **DESCRIPTION: If you incurred any brokerage and handling charges in a market economy location, such as Hong Kong, for sales to the United States, report that per-unit expense in the currency in which it was incurred.**
> >
> > **NARRATIVE: Identify the location, currency, and unit of measurement in which this expense is incurred. Explain how you arrived at the per-unit expense. Provide worksheets and a sample calculation.**

Id. STAPIMEX submitted its Section C response to the initial questionnaire ("CIQR") on September 5, 2024. CR. 241-286, PR 161-162. Below, is the Commerce question and STAPIMEX's response.

> **FIELD NUMBER 20.1: Market Economy Brokerage and Handling Expenses**
>
> **FIELD NAME: DMEBROKU**
>
> **DESCRIPTION: If you incurred any brokerage and handling charges in a market economy location, such as Hong Kong, for sales to the United States, report that per-unit expense in the currency in which it was incurred.**

> **NARRATIVE: Identify the location, currency, and unit of measurement in which this expense is incurred. Explain how you arrived at the per-unit expense. Provide worksheets and a sample calculation.**
>
> **ANSWER:**
>
> **During the POR, U.S customs brokers performed customs activities for each DDP sale to the United States. STAPIMEX paid brokerage and handling expenses through U.S. customs brokers. We have reported brokerage and handling charges basing on invoices issued by our customs brokers. For the remaining terms of delivery, we have reported "0" (zero) at this field.**

Id. at page 32. Clearly, STAPIMEX fully answered the question. It inadvertently did not include DMEBROKU in its Section C database.

Commerce issued a supplemental Section C questionnaire on March 27, 2025. P.R. 116. Questions 10.a., 10.b., and 10.c concerned DMEBROKU:

> 10. On page 33-34 (pdf page 40-41) of your CQR, for field number 20.1: market economy brokerage and handling expenses (DMEBROKU), you reported that for each DDP sale, Stapimex paid brokerage and handling expenses through U.S. customs brokers. However, you have not reported a DMEBROKU field in your U.S. sales database. Further, the instructions for this field state that you should report the per-unit expense for brokerage and handling charges incurred in a market economy (ME) location, such as Hong Kong, for sales to the United States.
>
> a. Please clarify whether Stapimex incurred DMEBROKU expenses in a market economy country and revise your section C database accordingly. Otherwise, please affirmatively state that Stapimex did not incur DMEBROKU expenses.
>
> b. If Stapimex did incur DMEBROKU expenses, please provide a chart which identifies each country in which these expenses occurred.

> c. For invoices [059/ART.23 and 054/SIA.23], please provide documentation demonstrating that Stapimex paid DMEBROKU expenses, including the customs broker invoices and documentation that these invoices were paid in a ME currency.

Id. The response was due March 17, 2025. STAPIMEX, on March 14, 2025, requested a one-week extension of time to respond, to March 24, 2025. P.R. 115. Commerce never responded to this request.

STAPIMEX submitted its response to the supplemental Section C questionnaire on March 24, 2025. C.R. 132, P.R. 112. Commerce rejected this submission on March 26, 2025. P.R. 114.

STAPIMEX requested reconsideration of this rejection on April 15, 2026. P.R. 111.

Commerce granted STAPIMEX's request to submit its response to the supplemental Section C questionnaire on May 13, 2025. P.R. 99. Commerce stated that this submission had to be identical to that submitted on March 24, 2025.

STAPIMEX refiled its March 24, 2025, response to the supplemental Section C questionnaire on May 14, 2025. C.R. 88; P.R. 98. STAPIMEX made no changes to the original supplemental response filed on March 24, 2025. <u>For example, Exhibit SC-15, Record Layout, states that the SAS dataset for Section C was prepared on March 23, 2025, at 12:54 p.m. This confirms that the Section C database submitted on May 14, 2025, was identical to the one filed on March 24, 2025.</u>

In responding on March 24, 2025, and May 14, 2025, since the responses were identical, STAPIMEX unknowingly "lost" question 10.c. That is, somehow (STAPIMEX believes it may have been in converting the PDF version of Commerce's supplemental question to Microsoft Word), Question 10.c. evaporated. Thus, in answering the

questionnaire, STAPIMEX did not know that there was a Question 10.c. Nevertheless, STAPIMEX's response to this questionnaire did contain four exhibits (SC-3.3, SC-3.4, SC-3.5, and SC-11, containing six customs brokerage invoices related to six U.S. sales. The six customs brokerage invoices uniformly contain line items for U.S. "customs brokerage." Thus, substantial evidence on the record demonstrates that STAPIMEX did incur and submit to Commerce evidence of payment for U.S. customs brokerage in the period of review ("POR").

Finally, we note that the List of Exhibits for this submission shows Exhibits SC-3.3, SC-3.4, and SC-3.5, as containing U.S. sales documentation. Those exhibits include customs broker invoices listing "customs brokerage" charges on individual sales. The List of Exhibits also shows Exhibit SC-11, stating that it contains a customs broker invoice. Again, that customs broker invoice shows a line item for "customs brokerage."

Accordingly, STAPIMEX answered Questions 10.a and 10.b, as follows:

> 10. On page 33-34 (pdf page 40-41) of your CQR, for field number 20.1: market economy brokerage and handling expenses (DMEBROKU), you reported that for each DDP sale, Stapimex paid brokerage and handling expenses through U.S. customs brokers. However, you have not reported a DMEBROKU field in your U.S. sales database. Further, the instructions for this field state that you should report the per-unit expense for brokerage and handling charges incurred in a market economy (ME) location, such as Hong Kong, for sales to the United States.
>
> a. Please clarify whether Stapimex incurred DMEBROKU expenses in a market economy country and revise your section C database accordingly. Otherwise, please affirmatively state that Stapimex did not incur DMEBROKU expenses.
>
> **RESPONSE:**
>
> **We are now reporting DMEBROKU expenses at field 20.1 in**

**our U.S. sales database. We paid brokerage and handling expenses to our broker in U.S.**

b. If Stapimex did incur DMEBROKU expenses, please provide a chart which identifies each country in which these expenses occurred.

**RESPONSE:**

**We paid DMEBROKU expenses only to our broker in U.S. for U.S. sales. Thus, there are no other DMEBROKU expenses to report.**

Id. at 7-8. While this response did not contain DMEBROKU in the Section C database, it was for a different reason from that in its original questionnaire response. Originally, DMEBROKU was not reported due to a simple clerical error by STAPIMEX– the DMEBROKU was not inserted in the database. For the supplemental Section C response, STAPIMEX sent a complete Section C database, including the field for DMEBROKU, to its outside computer consultant so she could convert it into a SAS dataset (entitled stapus02.sas7bdat); since this dataset was also submitted on March 24, 2025, the name of the dataset did not change). However, in this supplemental Section C database the computer consultant made a clerical error by unknowingly deleting the field DMEBROKU.

Commerce issued the preliminary results on June 5, 2025. P.R. 86. They were published in the Federal Register on June 11, 2025. P.R. 84. The accompanying Decision Memorandum ("PDM") was issued on June 5, 2025. P.R. 85. It issued a Memorandum concerning its analysis of the preliminary results ("calculation memo") on June 5, 2025. C.R. 47, P.R. 77.

At that time, while Commerce used total AFA to calculate a value for

DMEBROKU, it viewed this as a relatively small issue, such that it planned to verify STAPIMEX's responses.

Only after STAPIMEX read the PDM did it know that its Section C database submitted on May 24, 2025, was missing the field DMEBROKU.

On June 16, 2026, STAPIMEX wrote to Commerce stating (1) only as a result of the preliminary results did it know that its Section C database submitted on May 24, 2025, was missing DMEBROKU, and (2) Commerce made certain errors in its calculations of the dumping margin for the preliminary results. C.R. 40; P.R. 73. STAPIMEX also sought permission to file a correct Section C database, with the only change being the addition of a field for DMEBROKU.

On June 20, 2025, not having received a response from Commerce regarding permission to refile the Section C database, STAPIMEX submitted an amended Section C database, with the only change from the May 14, 2025, database being the addition of a field for DMEBROKU. C.R. 38; P.R. 72 (filed on ACCESS June 23, 2025).

On July 11, 2025, Commerce responded to STAPIMEX's letter of June 16, 2025. P.R. 68. Commerce determined that the missing DMEBROKU data and the perceived errors by STAPIMEX in reporting connum-specific information indicated that STAPIMEX had not participated in the administrative review to the best of its ability. As a result, by this letter, Commerce rejected the revised Section C database submitted on June 20, 2025, and cancelled verification. This was a clear indication that Commerce intended to use total AFA against STAPIMEX in the final results.

STAPIMEX submitted its case brief on November 14, 2025. C.R. 6, P.R. 34. STAPIMEX's counsel testified at the public hearing. Transcript at P.R. 120.

Commerce issued the final results on February 17, 2026. P.R. 11 The final results

were published in the Federal Register on February 23, 2026. P.R. 9. The accompanying Issues and Decision Memorandum ("IDM") was issued February 17, 2026. P.R. 10.

## 2. LEGAL ARGUMENT REGARDING DMEBROKU.

### a. The Federal Circuit has ruled that Commerce must correct errors committed by respondents in certain circumstances.

The statute requires that Commerce decisions must be predicated on substantial evidence on the record. The courts have approved this application of the statute in numerous cases. *See* 19 U.S.C. § 1516a(b)(1)(B). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp.* at 477, *quoting Consolidated Edison Corp. v. Labor Board*, at 22. Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, at 1562 (quotations omitted). Thus, the courts have stated that "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [ ] view.'" *Diversified Products Corp. v. United States*, at161 *quoting Universal Camera*, 340 U.S. at 488.

The record in its entirety demonstrates that STAPIMEX cooperated to the best of its ability. It made only one mistake: not supplying one very minor field of information, DMEBROKU (customs brokerage) in its supplemental Section C response.

The Federal Circuit, as stated in STAPIMEX's ministerial errors letter dated June 16, 2025, has observed that the over-riding principle is that Commerce must calculate the dumping margin as accurately as possible. It is the duty of Commerce to determine dumping margins

"as accurately as possible." *Rhone Poulenc, 899 F.2d 1185, 1191* (Fed. Cir. 1990). As the courts have stated, the antidumping laws are remedial not punitive. *Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-1104 (Fed. Cir. 1990)*. The affected U.S. industry is not entitled to a remedy in excess of the difference between foreign market value and U.S. price. It is clearly not entitled to duties on Canadian sales. NTN responded in a timely manner to the preliminary determination, pointing out Commerce's clerical errors, as well as its own. Commerce corrected its own but not NTN's errors. Correction of NTN errors would neither have required beginning anew nor have delayed making the final determination. A straightforward mathematical adjustment was all that was required. Failure to make it resulted in the imposition of many millions of dollars in duties not justified under the statute.

Moreover, the Federal Circuit has held that Commerce cannot use statutory deadlines as an excuse to not calculate dumping margins as accurately as possible. To do so is an abuse of discretion.

b. **Commerce abused its discretion.**

The courts have ruled that Commerce abuses its discretion when it rejects, on the basis of untimeliness, the exporter's request to correct clerical errors in its submission and to recalculate dumping duties on the basis of corrected information where failure to make the correction resulted in imposition of millions of dollars in duties not justified under the statute. *See NTN Bearing Corp. v. United States,* 74 F.3d 1204 (Fed. Circ., 1995). *Also See Tehnoimportexport v. United States, 15 C.I.T. 250, 766 F. Supp. 1169, 1178* (Ct. Int'l Trade 1991) (analyzing price regulation which provided for correction of errors in a party's submission if received in time to permit proper analysis and verification). Cited with approval by *NTN* at 1206-1208 (Fed. Cir. 1995). We note that Commerce originally intended to conduct a verification of STAPIMEX when the only issue was the missing field

DMEBROKU from the Section C database. Thus, since perfection is not required (*NTN* at 1208-09), STAPIMEX is allowed one mistake: failure to timely file the DMEBROKU field in the supplemental Section C response database. Commerce still intended to verify STAPIMEX's responses when it issued the preliminary results because it thought those responses were verifiable – including the exhibits containing "customs brokerage" in six customs brokerage invoices.

*See, also*, *SolarWorld Americas, Inc. v. United States,* at 1359 n.2. The APA provides for setting aside an agency decision if, for example, it is "an abuse of discretion," *5 U.S.C. § 706(2)(A)*, and the courts have reviewed decisions for an abuse of discretion, *see Goodluck India Ltd. v. United States*, at 1342-44.

When discretion is granted by Congress, it "should be exercised in light of the considerations underlying the grant of that discretion." *Halo Electronics, Inc. v. Pulse Electronics, Inc., 579 U.S. 93, 103, 136 S. Ct. 1923, 195 L. Ed. 2d 278 (2016)* (internal quotation marks and citation omitted). Discretion is abused if, for example, its exercise rests on "'a clear error of judgment'" in the "'consideration of the relevant factors.'" *Weyerhaeuser Co. v. United States Fish & Wildlife Service, 586 U.S. 9, 25, 139 S. Ct. 361, 202 L. Ed. 2d 269 (2018)* (quoting *Judulang v. Holder, 565 U.S. 42, 53, 132 S. Ct. 476, 181 L. Ed. 2d 449 (2011)*).

c. **Commerce cannot determine punitive dumping margins.**

The courts have also held that such treatment by Commerce is especially punitive when failure to correct any such mistakes leads to especially high dumping margins. Here, Commerce' failure to allow DMEBROKU data into the record, an amount that is worth, as noted above, as little as $0.0025 per pound as reported by STAPIMEX in Exhibit SC-11 of its supplemental Section C response, as compared to the total AFA amount of $0.76 per pound

used by Commerce and based on the highest expense Commerce could find in the Section C database, is punitive by any measure. *See* STAPIMEX's case brief, at 8, for a table showing a summary customs brokerage values contained in Exhibits SC-3.3, SC-3.4, and SC-3.5 of STAPIMEX's supplemental Section C response. All four exhibits contain customs brokerage invoices for six U.S. sales.

The punitive value of $0.76 per pound for customs brokerage resulted in a dumping margin calculated in the preliminary results, based, on <u>partial</u> AFA, of 35.29 percent, a rate nearly 50 percent higher than the Department would have calculated based on total AFA had STAPIMEX refused participate in the proceeding altogether. The country-wide rate is 25.76 percent. This country-wide rate is usually the basis for using total AFA. Commerce did reduce the rate in the final results to 25.76 percent. That, however, is still punitive and costing STAPIMEX's millions of dollars in unwarranted dumping duties.

Indeed, the U.S. Supreme Court has ruled that the public interest requires the right result, especially when the correction is made to a preliminary, not final, results. In some instances, a tension may arise between finality and the correct result. The Supreme Court has noted: "Whenever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." *Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367 U.S. 316, 321, 6 L. Ed. 2d 869, 81 S. Ct. 1611 (1961)* (footnote omitted). However, preliminary determinations are "preliminary" precisely because they are subject to change. Thus, the tension between finality and correctness simply did not exist at the time STAPIMEX requested correction of the preliminary results.

d. **STAPIMEX's submission of June 20, 2025, did not contain**

**multiple instances of new data compared to its supplemental Section C response dated May 14, 2025, which Commerce used in the preliminary results.**

Commerce argues that STAPIMEX's June 20, 2025, corrected Section C database, which included DMEBROKU, also contained multiple changes from its prior submissions, in addition to the inclusion of DMEBROKU. Comparing the June 20 response to the May 14, 2025, response shows the only new data was the inclusion of the field DMEBROKU. The exhibits containing the record layout of these databases demonstrate that they were both originally produced on March 23, 2025. *See, e.g,.* Exhibit SC-15 of the May 14, 2025, response. Both databases have a file name: stapus02.sas7bdat. The only difference is that the version submitted to Commerce on June 20, 2025, also included the field DMEBROKU. There were no other changes.

We believe that Commerce erroneously compared the June 20 database to the original Section C database submitted in the CIQR. That original database had a file name of stapus01.sas7bdat. Thus, substantial evidence on the record demonstrates that the June 20, 2025, Section C database was not "unverifiable" due to multiple discrepancies between it and the May 14, 2025, Section C database utilized by Commerce.

Should the Court remand this case to Commerce, without approving the use of the supplemental Section C database submitted to Commerce after the preliminary results, and the question then arises as to what value should be used for DMEBROKU, the statute and court decisions, given that STAPIMEX was a cooperative respondent, favor use of the six customs broker invoices contained in the supplemental Section C questionnaire response utilized by Commerce in the preliminary results (specifically: Exhibit SC 3.3, SC 3.4, SC-3.5, and SC-11), specifically delineating "customs brokerage" charges, as neutral facts available, to fill

any gaps in the administrative record. *See* 19 U.S.C. § 1677e(a).

In these instances, where a respondent is cooperative, Commerce must be reasonable and look to the administrative record if neutral facts available are submitted, as a gap-filling means to calculate a dumping margin as accurately as possible. This is in contrast to 19 U.S.C. § 1677e(b) which is reserved for noncooperative parties.

Further, Commerce must take greater care in applying 19 U.S.C. § 1677e(a) to a cooperative respondent, as opposed to utilizing 19 U.S.C. § 1677e(b) for a noncooperative respondent. *Mueller,* at 1234*,* cites with approval other cases which consistently hold that Commerce's power in this regard is limited. ("This result is wholly consistent with our precedents applying *subsection (b)* itself, which is properly directed to non-cooperating parties. This Court's decision in *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)*, required that, even for a non-cooperating party, *subsection (b)* be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." All the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix. Moreover, this Court's decision in *Changzhou* made clear that, in the case of a cooperating party, Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies.)

### B. STAPIMEX ANSWERED THE INITIAL QUESTIONNAIRE PRECISELY REGARDING (1) REPORTING OF CONTROL NUMBERS (CONNUMS) AND (2) PRODUCT CODES. THEREFORE, EACH LINE ITEM IN THE SECTION C AND D DATABASES CONTAINED CONNUM-SPECIFIC INFORMATION. FURTHER, COMMERCE NEVER ASKED ANY SPECIFIC QUESTIONS ABOUT CONNUM-SPECIFICTY IN SUPPLEMENTAL QUESTIONNAIRES.

## 1. FACTS

### a. STAPIMEX fully complied with all instructions in the initial questionnaire (IQR) regarding the submission of product codes and control numbers. Contrary to the Department's claims, there were no subsequent questions regarding this issue in any supplemental questionnaires.

Commerce, in its letter to STAPIMEX dated July 11, 2025, regarding its cancellation of verification, stated that it now found STAPIMEX's data to be unverifiable. It cited two reasons for this. First, as noted, *supra*, Commerce found that the May 14, 2025, Section C response it used was replete with erroneous information and not verifiable. This has been addressed, *supra*.

Second, the Department claims that STAPIMEX did not follow multiple instructions regarding how to report product codes and control numbers.

Commerce <u>does not acknowledge the real reason</u> there is an issue with product codes and connums. That real reason is that the Department intentionally ignored the "WARNING" in its SAS program used to calculate the dumping margin for the preliminary results, clearly indicating that there was a problem concerning the way in which the SAS program assessed the connums and product codes.

Rather, Commerce places the blame squarely on STAPIMEX, citing fictional questions in its questionnaires. Thus, Commerce directly states that it was the fault of STAPIMEX that Commerce's computer program did not accurately calculate a dumping margin.

> Additionally, in its June 16th letter, STAPIMEX notified Commerce of a merge error in the preliminary results SAS program. This happened because STAPIMEX reported its FOPs on a product code specific basis, not on a CONNUM-specific basis, as it was instructed to do multiple times and said it did prior to the preliminary results.

Commerce letter, July 11, 2025, at 3 (footnotes omitted). This is incorrect for three

reasons. First, as demonstrated, *infra*, STAPIMEX fully answered each question in the initial questionnaire. There were zero "multiple times" that Commerce asked questions in this regard – indeed, not even a single time in any supplemental questionnaire did Commerce ask any specific question regarding the reporting of connums and product codes in this context.

Second, there is not even a scintilla of evidence that STAPIMEX reported its data in any manner other than that required by the specific questions in the initial questionnaire. While the general instructions in the questionnaire direct respondents to report data on a connum-specific basis, the specific questions, noted above, in the initial questionnaire do not specify any basis, much less a "CONNUM-specific basis" to report this data. Rather, these specific questions require respondents to create a control number (connum) and to report the product code for each line item. This is what STAPIMEX did. Nothing more was asked. STAPIMEX reported this data as required by these specific questions in the initial questionnaire. STAPIMEX did not manipulate any data. The same is true for its reporting of product codes. The information was fully and accurately reported. There was no manipulation of data by STAPIMEX.

Third, thus, the Department's statement, above, that "as it {STAPIMEX} was instructed to do multiple times and said it did prior to the preliminary results" is not based on anything in the administrative record. Not once did the Department, in any questionnaire, instruct STAPIMEX to report either product codes or CONNUMs on any type of basis. As a result, STAPIMEX did not report either of these fields on any type of basis other than the basis by which it maintains this data in its record-keeping system (based on product codes).

Commerce seems to think that by answering the question in the initial questionnaire

on product codes this makes the response product-code specific. If it does, that is the fault of Commerce. It asked STAPIMEX to report product codes for each line item in the Section C database. STAPIMEX did this – no more, no less. If this makes the Section C database product-code specific, that is not the fault of STAPIMEX. STAPIMEX did not write the question. It simply answered it fully.

Accordingly, the statements by Commerce asserting that multiple questions were asked regarding this issue have no foundation in the administrative record and, therefore, are not predicated on substantial evidence on the record.

Below, STAPIMEX reproduces the relevant language in the initial Section C questionnaire and its responses, as appropriate, in its CIQR. These are the only instances in any questionnaire addressing the submission of data regarding product codes and control numbers and their components.

- **FIRST INSTANCE:**

**IV. Computer File of U.S. Sales**

In accordance with the instructions provided in this section, prepare a separate computer data file containing each sale made during the POR of the merchandise under consideration, including sales of further manufactured merchandise. Do not report cancelled sales. This file format has been designed to accommodate **export price** (EP) and **constructed export price** (CEP) transactions.

**ANSWER:**

**Exhibit C-1 contains the Section C database containing U.S. sales made in the POR.**

**See STAPIMEX response to IQR, p. 2.**

- **SECOND INSTANCE:**

For sales of merchandise that have been shipped to the customer and

invoiced by the time this response is prepared, each "record" in the computer data file should correspond to an invoice line item (*i.e.*, each unique product included on the invoice). For sales of merchandise that have not yet been shipped and invoiced (in whole or in part) to the customer, a "record" should correspond to the unshipped portion of the sale.
Each computer record submitted should contain the information requested concerning the product sold, the terms of the sale, the selling expenses incurred, and other information. The following portion of section C describes the information Commerce requires.

{NO RESPONSE WAS REQUIRED BY STAPIMEX TO THIS SET OF INSTRUCTIONS.}

*See* IQR at 3.

- **THIRD INSTANCE:**

**I. Summary of Data Fields for the U.S. Sales File**

The chart which follows is a summary of the data fields for the U.S. sales computer file which are described in the remainder of this section of the questionnaire. The chart lists the field number, description and name. Please also refer to the "Instructions for Submitting Computer Data" at Appendix II.

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 1.0 | Complete Product Code | PRODCODU |
| 2.0 | Matching Control Number | CONNUMU |
| 3.1 thru 3.n | Product Characteristics Product Characteristics | |

**V. Instructions for the Narrative Response and the Computer File of U.S. Sales**

The following instructions combine the questionnaire with the computer data file format. "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file. "FIELD NAME" includes the
"short" or variable name for the submitted printouts of the data file. "DESCRIPTION" defines the data you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in a narrative response.

| **Fields 1 through 3** |
| --- |
| Report the information requested concerning the product sold. Fields 1 and 2 are reserved for the product code and a matching control number Commerce will use in the calculation of the dumping margin. |

| |
| --- |
| Fields numbered 3.1 to 3.9 specify the product characteristics requested by Commerce. You may add additional product characteristics. However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that Commerce should use this information to define identical and similar merchandise. |

**FIELD NUMBER 1.0: Complete Product Code**

**FIELD NAME: PRODCODU**

DESCRIPTION: Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States. If the product sold is further manufactured in the United States, report the product code of the product sold, not the product imported.

NARRATIVE: The product code should be described in response to question 6b in section A of this questionnaire.

**ANSWER:**

**Stapimex has reported the product code field as requested. A complete description of the product codes, including an example of how to interpret the codes, is detailed in Exhibit C-6. The Stapimex product codes ultimately aids in the definition of the matching control number (CONNUMU), with any exceptions noted in the appropriate field description. Therefore, the product key in Exhibit C-6 also links the product code to the CONNUMU where appropriate to do so.**

**FIELD NUMBER 2.0: Matching Control Number**

**FIELD NAME: CONNUMU**

DESCRIPTION: Assign a control number to each unique product reported in the section C sales data file. Identical products should be assigned the same control number in each record in every file in which the product is referenced. Each unique combination of product characteristics based only on fields

3.1 - 3.n should be assigned a unique control number.

If the product sold is further manufactured in the United States, report the control number of the product imported, not the product sold.

NARRATIVE: List all CONNUMS, and indicate to which products they have been assigned. Include CONNUMs for all products described in Appendix III of the questionnaire, regardless of market destination.

**ANSWER:**

**The CONNUM is reported in the requested format. In Exhibit C-7, we provide a list of all reported CONNUMs with their corresponding product codes sold to the United States, and all other markets for all countries (including Vietnam). Stapimex sold both subject product and non-subject shrimp (tempura and breaded shrimp) to the United States in the POR. It is not reporting the non-subject merchandise.**

STAPIMEXS C IQR response, at 4-8. (emphasis in original).

**b. Commerce's supplemental questionnaires contained zero questions regarding the submission of product codes and connums.**

Contrary to the statements in Commerce's letter regarding cancellation of verification, the supplemental questionnaires contained zero questions regarding the reporting of product names (PRODCODU) and control numbers (CONNUMU) in terms of connum-specificity.

Thus, STAPIMEX was not instructed at any time, much less "multiple times" to report PRODCODU and CONNUMU on a connum basis. Rather, STAPIMEX was simply required to submit product codes and derive a CONNUMU from the choices Commerce presented in the IQR.

**c. Contrary to Commerce's opinion, STAPIMEX did not manipulate its product code or connum data in its Section C database.**

Commerce, in its July 11, 2025, verification cancellation letter, states that STAPIMEX manipulated its data regarding product codes and control numbers (connums).

> Additionally, in its June 16th letter, STAPIMEX notified Commerce of a merge error in the preliminary results SAS program. This happened because STAPIMEX reported its FOPs on a product code specific basis, not on a CONNUM-specific basis, as it was instructed to do multiple times and said it did prior to the preliminary results. We hereby notify you that Commerce does not intend to proceed with the in-person verification of STAPIMEX's questionnaire responses submitted in the above-captioned proceeding.

Commerce letter to STAPIMEX, July 11, 2025, at 3 (footnotes omitted). This statement is simply not accurate. As seen above, STAPIMEX reported its product codes and connums as requested by the Department. There is not even a scintilla of evidence that STAPIMEX "reported its FOPs on a product-code-specific basis, not on a CONNUM-specific basis." Rather, STAPIMEX simply reported this data as requested by the Department – nothing more, nothing less.

The two quotes in the above Commerce statement are not based on a scintilla of evidence. First, Commerce <u>never instructed STAPIMEX to report this product codes and connums on any basis</u>, much less on a "CONNUM-specific basis…" *Id*.

Second, there is not a scintilla of evidence that Commerce "instructed to do {connum specific basis} multiple times." *Id*. Indeed, there is no such instruction in even one questionnaire, much less "multiple times."

**d. Commerce has not adequately addressed its complete failure to cure the "WARNING" error its SAS computer program issued.**

This issue regarding the product code and connum reporting occurred for one reason only:

Commerce's failure to address the "WARNING" error message in its computer program when it performed its margin calculation for the preliminary results. Rather, Commerce stated that it was the fault of STAPIMEX that the Department's computer program issued a "WARNING." Commerce June 16, 2025 letter. *Id.* Commerce's letter to STAPIMEX, however, did not address that its SAS program issued a "WARNING,": much less why the Department chose to ignore the "WARNING."

Thus, the real questions are:

(1) why did Commerce fail to address the "WARNING" error? And

(2) why did Commerce not even attempt to calculate dumping margins as accurately as possible, predicated on substantial evidence on the record? The administrative record shows that Commerce knew there was a problem in its computer program and failed to take any remedial action.

Commerce has two methods to correct its error. First, as noted in STAPIMEX's June 16, 2025, at 8-9, letter regarding errors in the preliminary results, it can use the language, below, to accomplish the same result:

> The correct BY statement after the MERGE statement should read:
>
> **BY CONNUMU PRODCODU**;

Failure to properly code this merge will result in incorrect FOPs being assigned to some U.S. sales transactions. Thus, Commerce only needs to add "PRODCODU" to the "BY" statement to cure this error.

Alternatively, it can use one of its standard "macros" that it has used for years in market-economy cases, to merge data, such as the PRODCODU and CONNUMU data.

## 2. LEGAL ARGUMENT REGARDING CONNUM-SPECIFICTY

**A. Commerce's rationale for cancelling verification, in part, due to its perception that STAPIMEX incorrectly reported product codes and connums, calling the Section C response unverifiable, is without merit.**

**i. Commerce did not utilize substantial evidence on the record to determine that STAPIMEX's information was so flawed that it could not be verified.**

Commerce, in its verification cancellation letter of July 11, 2025, cites the following reason regarding its decision that the Section C database Commerce utilized in its preliminary results is unverifiable and, therefore, verification must be cancelled.

> In STAPIMEX's June 16th letter, it stated that the U.S. sales database provided in STAPIMEX's SCQR Resubmission, is an incorrect version. As STAPIMEX has requested to upload the "correct supplemental Section C database," the correct supplemental Section C database is missing from the record. Because there is only an incorrect version of STAPIMEX's U.S. sales database on the record, we find STAPIMEX's section C database unverifiable. Additionally, in its June 16th letter, STAPIMEX notified Commerce of a merge error in the preliminary results SAS program. This happened because STAPIMEX reported its FOPs on a product code specific basis, not on a CONNUM-specific basis, as it was instructed to do multiple times and said it did prior to the preliminary results. We hereby notify you that Commerce does not intend to proceed with the in-person verification of STAPIMEX's questionnaire responses submitted in the above-captioned proceeding.

Commerce verification cancellation letter, July 11, 2025, at 3 (footnote omitted). As noted, *supra*, the "facts" as stated by Commerce are erroneous. There are several important points to be made regarding the connum-specific issue.

First, STAPIMEX answered the specific question regarding the reporting of connums fully. There is no missing information.

Second, STAPIMEX reported connums for each line item in both the Section C and Section D (reporting factors of production) databases.

Third, STAPIMEX reported product codes exactly as requested in the Section C questionnaire. These were reported in both the Section C and D databases. STAPIMEX did not

manipulate any data in doing so.

Fourth, STAPIMEX, as part of its initial Section C questionnaire response (CIQR) submitted Exhibit C-7. This was a roadmap showing Commerce exactly how it had reported connums and product codes. It was a complete listing of connums, a description of each product associated with each connum, and the product code associated with each connum. This information is complete, accurate, and verifiable.

Fifth, in the supplemental questionnaires Commerce never asked a first question, much less a second question regarding STAPIMEX's narrative response to the initial questionnaire regarding connum reporting and product codes . Nor did Commerce ask any questions about Exhibit C-7 reported in the CIQR.

As a result, Commerce did not meet it burden under 19 U.S.C. § 1677m(d). Only in Commerce's July 11, 2025, letter did it notify STAPIMEX for first time that there was an issue with it reporting of connums and product codes. Then, it only advised STAPIMEX of this issue because STAPIMEX had first notified it of the "WARNING" signal it had ignored in its calculations for the preliminary results.

As a result, Commerce has no basis under the statute to find that STAPIMEX did not cooperate to the best of its ability. Rather, Commerce did not allow STAPIMEX to act to the best of its ability because Commerce ignored Exhibit C-7 in the CIQR and its own "WARNING" in its computer program.

Thus, Commerce's decision to not verify is not predicated on substantial evidence on the record.

The courts will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record, or are not otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). Also, see *Universal Camera Corp* at 477 (1951), *quoting Consolidated Edison Corp.;*

*Atlantic Sugar.*

**ii. Commerce abused its discretion in finding that STAPIMEX did not act to the best of its ability in reporting connums and prodcodes.**

Commerce decisions, even if based on substantial evidence cannot be an abuse of discretion.

*See, e.g., SolarWorld* at 1359, n2. In addition, the Administrative Procedures Act ("APA") provides for setting aside an agency decision if, for example, it is "an abuse of discretion," *5 U.S.C. § 706(2)(A)*, and the courts have reviewed decisions for an abuse of discretion, *see Goodluck India Ltd. at 1342-44.*

Moreover, when discretion is granted by Congress, it "should be exercised in light of the considerations underlying the grant of that discretion." *Halo Electronics,* at 103 (internal quotation marks and citation omitted). Discretion is abused if, for example, its exercise rests on "'a clear error of judgment'" in the "'consideration of the relevant factors.'" *Weyerhaeuser Co.*at 24 (quoting *Judulang* at 53). .

Here, Commerce never asked a single question regarding STAPIMEX's complete answers to the specific questions regarding reporting of connums and product codes.

**iii. Commerce was arbitrary and capricious in its decision.**

Commerce also must make its decisions based on a fair and balanced comparison of the data. To do otherwise is arbitrary and capricious. It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co.* ,at 1378. Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g.*, *SKF USA. Inc.* at 1028.

"{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, and that "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine*

*Chem. Factory* 1377 (hereafter *Changzhou*), quoting *Bowman Transp.,* at 284.

Commerce is required to objectively evaluate all data on the record. Thus, it must hold its preferences to the same test as it uses to evaluate respondent's proffered data. This analysis must consider the strengths and weaknesses of all the data and then choose the best available information. *See, e.g., Dorbest Ltd* at 1302 (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

Moreover, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." *Thai Pineapple Canning Indus. Corp. v. United States*, 273, F.3d 1077, 1085 (Fed. Cir. 2001).

**iv. There exists no missing or erroneous information regarding product codes and/or control numbers (connums).**

Commerce argues that the submission of product codes and connums by STAPIMEX was erroneous. Commerce claims that its "merge error" in the preliminary results "happened because STAPIMEX reported its FOPs on a product code specific basis, not on a CONNUM-specific basis, as it was instructed to do multiple times and said it did prior the preliminary results." Commerce letter, July 11, 2025, at 3.

None of this is accurate. First, STAPIMEX did not report either the Section C (U.S. sales) database of the Section D (factors of production) database on any basis other than that required in the initial Section C questionnaire when it simply submitted data requested: (1) create a connum, and (2) report product codes for each line item in the databases. There is not a scintilla of evidence to support Commerce's claim that STAPIMEX manipulated data in clear

contravention of instructions from Commerce. Commerce cites no evidence on the administrative record to support its claim.

Second, STAPIMEX was not instructed "multiple times" to submit its product code and connum data in any manner other than that in which it did. Commerce, again, cites no evidence on the administrative record to support its claim.

Third, Commerce claims that STAPIMEX repeatedly stated in submissions that "it did" report connums correctly. *Id*. Again, this is not accurate. Nowhere on the administrative record did Commerce instruct STAPIMEX, other than in the initial questionnaire, to report product codes and connums in any specific manner, much less did STAPIMEX state that it followed these phantom instructions.

Rather, the initial questionnaire, for connums, presents a list of physical attributes for shrimp –contained in a list of categories. Using those categories, STAPIMEX created a connum for each line item in it U.S. sales database and reported that connum in the appropriate field. That is the only way to report connums. Again, this is very simple and not open to interpretation. STAPIMEX reported this same data (connums and product codes) in its Section D database.

**v. The use of total adverse facts available is not predicated on substantial evidence and is otherwise contrary to law.**

As stated, *supra*, total AFA may only be used in accordance with the statute when information is missing and the Department has asked at least twice for it. 19 U.S.C. § 1677m(d). Commerce's only rationale for cancelling verification states:

> Because there is only an incorrect version of STAPIMEX's U.S. sales database on the record, we find STAPIMEX's section C database unverifiable.

Commerce letter, July 11, 2025, at 3. When Commerce issued the preliminary results, it knew of one error in the supplemental Section C database: missing DMEBROKU. Yet, it

was prepared to verify STAPIMEX.

Now, Commerce found it appropriate to use total AFA against STAPIMEX not only regarding DMEBROKU but due to what it believes is STAPIMEX's misreporting connums. STAPIMEX fully complied with the original questionnaire, as noted above.

It is Commerce which has not met it burden under 19 U.S.C. § 1677m(d). The administrative record shows that STAPIMEX fully advised how it reported connums and product codes in its Exhibit C-7 in the CIQR. Commerce did nothing with that. Commerce asked no questions regarding either the narrative responses in the CIQR, Exhibit C-7, or STAPMEX's supplemental Section C questionnaire response.

Since Commerce asked no questions, it also (1) did not promptly inform STAPIMEX of any issue in this regard, and (2) did not give STAPIMEX the opportunity to address any issues that Commerce believed existed in this regard.

Thus, the cancelling of verification and use of total AFA is without merit since STAPIMEX has not contravened 19 U.S.C. §1677m(d), and Commerce has not met its burden under the same provision.

Nor can Commerce simply cite a statutory provision without linking that provision to the facts of the proceed.

> A finding that simply restates the statutory standard and is unsupported by any discussion linking the applicable standard to the particular facts is inadequate." *ABB II, 355 F. Supp. 3d at 1223*. Therefore, Commerce's resort to facts available, including with an adverse inference, is unsupported by substantial evidence and otherwise inconsistent with law.

*Hyundai Heavy Indus. Co. v United States*, 393 F. Supp. 3d 1293, 1311 (Ct. Intl Trade, 2019).

STAPIMEX did not fail to respond to questions prior to the preliminary results other than not reporting DMEBROKU, due to a clerical error.

## C. COMMERCE MADE ERRORS IN ITS CALCULATIONS IN THE PRELIMINARY RESULTS. THEY SHOULD BE CORRECTED IN THE FINAL RESULTS.

STAPIMEX, by letter dated June 16, 2025, notified Commerce of other errors it believes are contained in the preliminary results. That letter is incorporated herein by reference. That letter includes the SAS codes actually used by Commerce, as well as the SAS codes that STAPIMEX believes should be used to correct these errors.

### a. FACTS

Those errors include the following.

#### 1. Incorrect Raw Material (RM) Surrogate Value applied to <u>fresh</u> raw shrimp.

In Section D database, STAPIMEX reported FOP for fresh shrimp input in kilograms of Head Less Shell On (HLSO) used to produce one kilogram of finished product, and it corresponds to the raw material's count size, which is measured in Head On Shell On (HOSO) pieces per pound (pcs/lb). This HOSO count size is the basis on which the DOC's surrogate values should be applied.

STAPIMEX found that DOC made two errors: (i) unit of measurement and (ii) unnecessary count size conversion of shrimp form, which led to the use of inaccurate surrogate values for the fresh shrimp input.

<u>*i)*</u> <u>***DOC constructed***</u> surrogate values for the fresh shrimp input using Indonesia's prices of HOSO shrimp (shrimp form) for each count size calculated by <u>***pieces per kilogram***</u> (unit of measurement). <u>***STAPIMEX reported***</u> the <u>***count size***</u> of fresh shrimp in <u>***HOSO***</u> form and in <u>***pieces per pound***</u> unit. Consequently, DOC's failure to convert the unit of measurement of STAPIMEX's count size data from pcs/lb to pcs/kg resulted in the use

of inaccurate surrogate values.

***ii)*** In addition, ***DOC converted count size from HLSO form to HOSO form***. Since ***STAPIMEX had already reported*** count size in **HOSO form**, DOC's conversion was redundant and therefore incorrect. _

The only necessary conversion to align STAPIMEX's data with the surrogate value provided by DOC is to change unit of measurement of the count size from pieces per pound to pieces per kilogram. Since one kilogram is approximately 2.20 pounds, this can be done by simply multiplying STAPIMEX's lower range and upper range count size by 2.204623. The table contained in the June 16k 2025, letter provides an illustration of this correct conversion.

**2. Commerce erred in computing the larvae input cost.**

Commerce used a surrogate value (SV) for shrimp rather than an SV for larvae in its calculation. This resulted in a substantial error in Commerce's calculations. The SV for domestic shrimp used by Commerce is approximately $8.29 per kg (Indonesian rupiah 123,709.60). The administrative record shows an SV for larvae of approximately $0.00282 per piece. STAPIMEX's letter of June 16, 2025, shows the incorrect SAS language and the proposed corrected language.

**3. Commerce erred in computing frozen shrimp input cost.**

Commerce erred by converting from HLSO (headless shell on) shrimp to HOSO (head on shell on) shrimp because the SV data for frozen shrimp (FRZNSHRIMP_SV_USD) pertains to HLSO shrimp, not HOSO shrimp. Thus, this conversion by the computer program from HLSO to HOSO basis is incorrect. STAPIMEX's June 16, 2025, letter contains the corrected SAS code.

**b. LEGAL ARGUMENT**

**1. Commerce is required to correct its mistakes: both those based on a lack of substantial evidence on the record, as well as any mistakes found in its computer programs.**

Regardless when a mistake by Commerce is made, it is required to correct it. This is true both

after it issues the preliminary results and after the final results.

The courts have construed the correction of errors liberally. Commerce may correct errors, even those made by a respondent, that are timely raised. *Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006)* ("Commerce is free to correct any type of importer error-clerical, methodolog[ical], substantive, or one in judgment-in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections."). In the instant situation, STAPIMEX notified Commerce just five days (Juen 16, 2025) after the preliminary results were published (June 11, 2025) of errors by the Department.

The Federal Circuit has found that "Commerce is not required to correct a final determination reflecting an error made by a private party when that error is not apparent from Commerce's final calculations released pursuant to *19 C.F.R. § 351.224(b)*, or from the final determination itself." *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd., 334 F.3d 1284, 1292 (Fed. Cir. 2003)*. Only "when an error is <u>apparent (or should have been apparent) from the face of the calculation or from the final determination itself and goes uncorrected, that error, in effect, becomes a government error and, hence, a 'ministerial' error, and the government is required to correct it.</u>" *Id* (emphasis added*).* (citing *Koyo Seiko Co. v. United States, 746 F. Supp. 1108, 1111, 14 Ct. Int'l Trade 680, SLIP OP. 90-97 & n.4 (1990)* (a respondent's error was sufficiently obvious to require correction when it resulted in negative and positive dumping margins in excess of 16,000 percent)). (Emphasis added).

In addition, Commerce's refusal to correct an error is an abuse of discretion, even when that error is raised late. *Alloy Piping Products v. Kanzen Tetsu, 334 F.3d 1284, 1293 (Fed. Cir. 2003)*, holding that, "where an error is apparent on the face of Commerce's determination or from

the calculations underlying that determination, it requires correction after the final determination." (emphasis added).

In the instant situation, Commerce was fully aware of the “WARNING” message it received in its computer program. It was not necessary for STAPIMEX to bring it to the Department’s attention. Nevertheless, as soon as practicable after Commerce released its computer code used in the preliminary results, STAPIMEX notified Commerce.

Not only substantive errors, but even ministerial errors must be fixed by the Department. The courts have concluded, as has Commerce, that an error in the SAS computer program constitutes a clerical error that must be fixed.

> At the oral argument held on December 8, 1994, Commerce stated that it would inform the Court as to whether it had indeed failed to correct the error. By letter dated December 12, 1994, Commerce suggested that a remand is necessary to correct the error in the SAS computer program.
>
> In light of Commerce's failure to correct the error for the Final Results, the Court agrees that a remand is necessary. As such, the Court remands to correct the error in the SAS computer program.

*RHP Bearings v. United States*, 19 C.I.T. 1389 *; 1995 Ct. Intl. Trade LEXIS 246 **; 17 Int'l Trade Rep. (BNA) 2460; SLIP OP. 95-194, at 22. (Ct. Intl. Trade, 1995).

In addition, computer errors by Commerce have been determined by the courts to be a mandatory basis for correction.

> In *Serampore*, the Court, while affirming a portion of the remand results, granted a second remand for Commerce to determine whether an alleged clerical computer input error had been made, notwithstanding that the error was apparently not within the scope of the first remand and not raised in the previously underlying decision. 12 CIT at 834, 696 F. Supp. at 673. The Court noted that it was "loathe to affirm a determination that might be based on a questionable record."

> *Id.* If Commerce agreed there was such an error, it was directed to make appropriate corrections. *Id.*

*Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 995. (Ct. Intl. Trade, 1992).

These cases amply demonstrate that Commerce has no discretion. It should admit that it ignored its "WARNING" error message and make the necessary correction. Commerce's failure to follow its standard procedures in this type of situation is arbitrary and capricious.

## VI. <u>CONCLUSION AND RELIEF REQUESTED.</u>

For the forgoing reasons, STAPIMEX requests that the Court grant is Rule 56.2 Motion for Judgment Upon the Agency Record because Commerce's actions as described above were unsupported by substantial evidence and otherwise not in accordance with law.

<u>*/s/ John J. Kenkel*</u>
John J. Kenkel
International Trade Law
Counselors, PLLC
8647 Richmond Hwy.
Suite 623
Alexandria, Va. 22309
*Counsel to Soc Trang Seafood Joint Stock Company (STAPIMEX)*

Dated: August 14, 2026

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | | |
|---|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX) Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Court No. 26-02435 |
| Defendant, | ) | |
| and | ) | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, Defendant-Intervenors. | ) | |

**Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in the Chambers Procedures, I hereby certify that this brief contains 12,247 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

Respectfully submitted,

*/s/ John J. Kenkel*
John J. Kenkel

International Trade Law Counselors, PLLC
8647 Richmond, Hwy, Suite 623
Telephone: (703) 390-4064
Email: IntlTradeLawCounselors@outlook.com
*Counsel for Soc Trang Seafood Joint Stock Company (STAPIMEX).*

Dated: August 14, 2026