**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE**

| | |
|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX),<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>*and*<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>*Defendant-Intervenors.* | **Court No. 26-02435** |

**RESPONSE OF DEFENDANT-INTERVENOR AMERICAN SHRIMP PROCESSORS ASSOCIATION IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD**

October 22, 2026

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES .......... ii

RULE 56.2 STATEMENT .......... 2

STATEMENT OF THE FACTS .......... 4

I. Commerce's rejection of STAPIMEX's brokerage and handling reporting .......... 4

II. Commerce's rejection of STAPIMEX's FOP reporting and undisclosed sales database changes .......... 5

STANDARD OF REVIEW .......... 9

ARGUMENT .......... 10

I. The Court should reject STAPIMEX's claims not raised in its complaint .......... 10

II. STAPIMEX fails to engage with the facts regarding its brokerage and handling reporting .......... 12

*A. STAPIMEX's arguments regarding its brokerage and handling reporting are irrelevant and unripe .......... 12*

*B. STAPIMEX's own admissions rebut its claim that its noncooperation was limited to mistakenly omitting a database field .......... 14*

*C. Commerce was not required to accept STAPIMEX's attempts to provide the data only after the preliminary determination .......... 17*

III. STAPIMEX's arguments regarding Commerce's application of total AFA ignore basic facts on the record and Commerce's explanations .......... 21

*A. STAPIMEX disregards the fact that Commerce specifically instructed STAPIMEX to report FOPs on a CONNUM-specific basis .......... 21*

*B. STAPIMEX's claims regarding Commerce's detection of undisclosed changes in STAPIMEX's sales reporting are speculative and ignore Commerce's actual explanations .......... 25*

*C. Lacking correct and reliable sales and FOP data, Commerce properly canceled verification .......... 27*

*D. STAPIMEX ignores the fact that Commerce directly addressed STAPIMEX's claims about the program warning .......... 29*

IV. Because Commerce properly applied total AFA to STAPIMEX, STAPIMEX's remaining arguments are futile .......... 31

CONCLUSION .......... 33

## TABLE OF AUTHORITIES

**Cases**

*ABB Inc. v. United States*, 190 F. Supp. 3d 1159 (Ct. Int'l Trade 2016) .................. 10

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339 (Fed. Cir. 2015)........................................................................................... 6

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284 (Fed. Cir. 2003)......................................................................................... 31

*Am. Tubular Prods., LLC v. United States*, No. 13-00029, 2015 WL 5236010, Slip Op. 15-98 (Ct. Int'l Trade Aug. 28, 2015), *aff'd*, 847 F.3d 1354 (Fed. Cir. 2017) ..................................................................... 26

*Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198 (Ct. Int'l Trade 1986)....................................................................................... 16

*Bomont Indus. v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ................................................................................................ 29

*China Steel Corp. v. United States*, 393 F. Supp. 3d 1322 (Ct. Int'l Trade 2019)....................................................................................... 27

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..................................................... 9

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................................... 9

*Dexter Distribution Grp. LLC v. United States*, 747 F. Supp. 3d 1369 (Ct. Int'l Trade 2024)............................................................................ 11

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012)........................... 19

*Fischer S.A. Comercio, Industria & Agricultura v. United States*, 34 C.I.T. 334 (2010)....................................................................................... 20

*Ford Motor Co. v. United States*, 896 F. Supp. 1224 (Ct. Int'l Trade 1995) ................................................................................................ 11

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021)...................... 29

*Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021)..................................................................................... 20

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)................................................................................ 6, 24

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021)................................................. 20

*INS v. Elias- Zacarias*, 502 U.S. 478 (1992) ............................................................ 9

*Kisaan Die Tech Priv. Ltd. v. United States*, 665 F. Supp. 3d 1364 (Ct. Int'l Trade 2023), *reconsideration denied sub nom. Chandan Steel Ltd. v. United States*, 729 F. Supp. 3d 1357 (Ct. Int'l Trade 2024) ........ 20

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ........ 10

*Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549 (2013) ........ 20

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ........ 16, 18, 19

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ........ 19

*Papierfabrik Aug. Koehler SE v. United States*, 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014), *aff'd*, 843 F.3d 1373 (Fed. Cir. 2016) ........ 19

*Pirelli Tyre Co. v. United States*, 539 F. Supp. 3d 1257 (Ct. Int'l Trade 2021) ........ 11

*QVD Food Co. v. United State*s, 658 F.3d 1318 (Fed. Cir. 2011) ........ 17, 28

*Severstal Exp. GmbH v. United States*, 374 F. Supp. 3d 1368 (Ct. Int'l Trade 2019) ........ 27

*Shandong Rongxin Imp. & Exp. Co. v. United States*, 355 F. Supp. 3d 1365 (Ct. Int'l Trade 2019) ........ 17

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008 (Ct. Int'l Trade 1992) ........ 17, 29

*Tianjin Magnesium Int'l Co. v. United States*, 32 C.I.T. 1 (2008) ........ 14

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........ 9

*Verson, a Div. of Allied Prods. Corp. v. United States*, 22 C.I.T. 151 (1998) ........ 32

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ........ 28

*Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314 (Ct. Int'l Trade 2017) ........ 11

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 29 C.I.T. 1266 (2005) ........ 11, 12

STATUTES

19 U.S.C. § 1516a(a)(1) ........ 11

19 U.S.C. § 1516a(b)(1)(B) ........ 9

19 U.S.C. § 1677e ........ 5

**REGULATIONS**

19 C.F.R. § 351.224(c) ........................................................................................ 6

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE**

| | |
|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX),<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>*and*<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>*Defendant-Intervenors.* | **Court No. 26-02435** |

**RESPONSE OF DEFENDANT-INTERVENOR AMERICAN SHRIMP PROCESSORS ASSOCIATION IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD**

Pursuant to USCIT Rule 56.2 and this Court's Orders of June 3 and July 17, 2026 (ECF 25 and 28), Defendant-Intervenor the American Shrimp Processors Association ("ASPA") respectfully submits its response in opposition to the motion for judgment on the agency record filed by Plaintiff Soc Trang Seafood Joint Stock Company ("STAPIMEX" or "Plaintiff") (ECF 29). For the reasons set out below, ASPA respectfully requests that this Court deny STAPIMEX's motion for judgment on the agency record.

## RULE 56.2 STATEMENT

1. In this action, Plaintiff challenges the Department of Commerce's ("Commerce") final results in the 2023-2024 administrative review of the antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam. *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8429 (Dep't Commerce Feb. 23, 2026), P.R. 9;[1] and the accompanying Issues and Decision Memorandum ("IDM"), P.R. 10.

2. <u>Issues Presented and Statement of the Argument</u>:

    1. <u>Whether the Court should consider challenges STAPIMEX raised in its Rule 56.2 brief but omitted from its amended complaint</u>: No. The scope of this action is confined to the claims properly raised in the complaint. As Plaintiff has neither sought consent nor requested leave to amend its complaint to add these challenges, the Court should decline to consider them.

    2. <u>Whether Commerce permissibly rejected STAPIMEX's untimely submission of missing brokerage and handling data and preliminarily applied partial AFA for its reporting failures</u>: Yes. Commerce's preliminary application of partial AFA to STAPIMEX's was not carried over to Commerce's determination of STAPIMEX's final margin, making challenges to that

[1] Items on the public record of this case are identified by "P.R." and the relevant document number.

preliminary treatment immaterial to the determination actually under review. In any event, STAPIMEX repeatedly omitted the requested database field on this expense and failed to provide supporting documentation expressly requested by Commerce. Commerce was not required to remedy those failures for STAPIMEX or to accept its STAPIMEX's untimely submission after the preliminary results.

3. Whether Commerce properly canceled verification and applied total AFA after discovering STAPIMEX's noncompliant FOP reporting and undisclosed sales database changes: Yes. Despite having received express instructions and having represented that it had complied, STAPIMEX did not report CONNUM-specific FOPs, and its sales databases contained unexplained differences. Commerce expressly has addressed STAPIMEX's claims concerning both the database comparison and the programming warning, explaining why the reporting deficiencies left the agency without reliable, verifiable data.

4. Whether alleged errors in Commerce's preliminary valuation of shrimp inputs warrant relief when Commerce did not use those calculations in the final results: No. Because Commerce properly applied total AFA for the final results, the alleged preliminary calculation errors had no effect on STAPIMEX's final margin. The Court should reject these challenges because they seek an advisory ruling on calculations that were not included in Commerce's determination.

## STATEMENT OF THE FACTS

### I. Commerce's rejection of STAPIMEX's brokerage and handling reporting

In its original questionnaire to STAPIMEX, Commerce directed STAPIMEX to report with its selling expenses any brokerage and handling expenses STAPIMEX had incurred from a market economy provider in the "DMEBROKU" field of STAPIMEX's U.S. sales database. P.R. 200 at 48 (C-21).

When Commerce reviewed STAPIMEX's first response, Commerce discovered that STAPIMEX had not included that field in the database it filed. *See* P.R. 116 (Commerce's supplemental section C questionnaire) at 6. In addition to directing STAPIMEX to add that field as previously instructed, Commerce also asked STAPIMEX certain follow-up questions regarding STAPIMEX's narrative explanation of its DMEBROKU calculations. In that three-part question, Commerce directed STAPIMEX, inter alia, to provide certain documents supporting STAPIMEX's numerical claims. *Id.* at 7 (question 10, part c).

Despite claiming otherwise, STAPIMEX again failed to include the DMEBROKU field in the revised sales database submitted with its supplemental questionnaire response. *See* P.R. 98 (STAPIMEX's supplemental section C response) at 8; P.R. 84 (Commerce's preliminary IDM) at 7. Moreover, STAPIMEX entirely ignored the third part of Commerce's question, neither responding to it nor even acknowledging Commerce's instructions. *See* P.R. 98 at 8 (STAPIMEX did not repeat part c of Commerce's question 10, although STAPIMEX repeated the questions it did answer).

In its preliminary determination, Commerce noted that STAPIMEX had failed to report DMEBROKU in its sales database despite two instructions to do so, had not responded to part c of Commerce's supplemental question, and had not provided the required supporting documentation. Preliminary IDM, P.R. 84 at 7. As STAPIMEX had ignored Commerce's instructions, Commerce found STAPIMEX to be noncooperative and so applied partial adverse facts available ("AFA") under 19 U.S.C. § 1677e. *Id.* at 6-8. Commerce applied AFA by assigning each reported U.S. sale a DMEBROKU amount equal to the highest U.S. expense STAPIMEX had reported. *Id.* at 8.

Following the release of the preliminary results, STAPIMEX claimed it was unaware that the field remained missing from its database, blaming the issue on an "independent computer consultant" who had submitted what STAPIMEX claimed was the "original database." *See* P.R. 10 at 31. Acting without authorization from Commerce, STAPIMEX then attempted to submit what it labeled as the corrected database. *Id.*; *see also* P.R. 72 at 2-3. As that submission was untimely, Commerce rejected it from the record. P.R. 10 at 31. STAPIMEX neither addressed the missing documentation nor attempted to submit it. *See id.*

## II. Commerce's rejection of STAPIMEX's FOP reporting and undisclosed sales database changes

Also following Commerce's preliminary determination, STAPIMEX raised what it claimed were errors that Commerce had made in its calculations of

STAPIMEX's dumping margin.[2] P.R. 73 at 6-9. STAPIMEX claimed that Commerce's computer program returned an error warning that STAPIMEX argued was due to an issue with merging the sales and factor of production ("FOP") databases it had submitted. *Id.* at 8.

Commerce's long-established practice is to direct respondents to report FOPs on a control-number ("CONNUM") specific basis, using control numbers derived from the product-specific characteristics specified by Commerce. *See, e.g.*, *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1340 (Ct. Int'l Trade 2020) ("Commerce insists that respondents tie their factors of production to control numbers because Commerce uses the respondents' control number–specific factors of production to construct the value of the product sold by the respondent company in the United States to ensure that a fair comparison is made between the U.S. price and normal value." (cleaned up)); *see also*, *e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1347 n.9 (Fed. Cir. 2015) (discussing Commerce's CONNUM-specific practice regarding frozen shrimp).

Consistent with that practice, Commerce had specifically directed STAPIMEX to report CONNUM-specific FOPs in this review:

> If you are not reporting factors of production (FOPs) using actual quantities consumed to produce the merchandise under review *<u>on a CONNUM-specific basis</u>*, please provide a detailed explanation of all efforts undertaken to *<u>report the actual quantity of each FOP consumed to produce the</u>*

[2] Commerce's regulations direct parties to raise alleged ministerial errors in preliminary review results in their case briefs, not in post-preliminary letters. *See* 19 C.F.R. § 351.224(c).

> *merchandise under review on a CONNUM-specific basis*. Additionally, please provide a detailed explanation of how you derived your estimated FOP consumption for merchandise under review *on a CONNUM-specific basis* and explain why the methodology you selected is the best way to accurately demonstrate an accurate consumption amount. For the most significant material input, for electricity, and for labor, please reconcile with worksheets the estimated consumption of these FOPs for a specific CONNUM to your cost-of-production (COP) ledger or the equivalent production ledger.

P.R. 200 at 63 (D-2, "Reporting Factors of Production"; emphasis added).

In response, STAPIMEX repeated these instructions verbatim and then stated "{w}e have reported FOPs as requested, using actual data maintained by Stapimex in its accounting system." P.R. 161 (STAPIMEX's section D response) at 246 (D-3). Commerce subsequently reiterated in its supplemental questionnaire that STAPIMEX's FOP reporting should be on a CONNUM-specific basis. *See* P.R. 10 (Final IDM) at 42 (listing occasions when Commerce issued these instructions to STAPIMEX).

Reviewing the FOP programming error STAPIMEX alleged following the preliminary determination, Commerce discovered that the error arose not from differences in the lengths of the product codes STAPIMEX had reported, as STAPIMEX claimed, but from individual CONNUMs appearing multiple times in the database with distinct factors of production. *See id.* at 44-45. This led Commerce to realize that STAPIMEX had not reported CONNUM-specific FOPs, but had reported FOPs by STAPIMEX's own product codes. *Id.* at 45. Because multiple product codes mapped to a single CONNUM, individual CONNUMs appeared

multiple times in the database with different sets of FOPs. *Id.*

Looking further into STAPIMEX's post-preliminary claims, Commerce also examined the second sales database that STAPIMEX had submitted, which STAPIMEX now claimed was the mistaken resubmission of the original database by a consultant. To determine whether STAPIMEX's claims were correct, Commerce compared the databases STAPIMEX had submitted prior to the preliminary determination. *See id.* at 39-40.[3]

When Commerce examined the database that STAPIMEX claimed was the erroneous resubmission of the original sales database (*i.e.*, the database without the DMEBROKU field), Commerce discovered that STAPIMEX had not complied with the instruction to resubmit its supplemental response without changes. Commerce instead found undisclosed differences between the original database and the supplemental "resubmitted" database, despite STAPIMEX's claim that the two were identical. *Id.* at 40; *see also* P.R. 68 (Commerce letter to STAPIMEX) at 2.

Lacking both a reliable and correct sales database that corresponded to STAPIMEX's reporting claims and a FOP database that provided the data on a CONNUM-specific basis as required by Commerce, Commerce determined that the record could not be verified and therefore canceled the scheduled in-person

[3] Commerce had originally rejected STAPIMEX's supplemental response as STAPIMEX had failed to submit it by the deadline set by Commerce. *See* P.R. 10 at 40. Commerce subsequently allowed STAPIMEX to resubmit its supplemental response. However, Commerce warned STAPIMEX that it was not allowed to make any changes to its supplemental response when it resubmitted it. *Id.*

verification of STAPIMEX's reporting. *Id.* at 3. Because Commerce lacked reliable and verifiable sales and FOP data from which to calculate a dumping margin, it applied total AFA to STAPIMEX in the final results. *See* P.R. 10 (Final IDM) at 46-48.

**STANDARD OF REVIEW**

This Court will only "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). A decision is supported by substantial evidence when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

As it is the agency empowered by Congress to administer the statute in this area, Commerce's decisions are due deference and are set aside only where "no reasonable factfinder" could have reached the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). The Court does not reweigh the evidence or substitute its judgment for Commerce's, but instead examines whether Commerce's decisions were supported by substantial evidence. *Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). "The fact that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence." *ABB Inc. v. United States*, 190 F. Supp. 3d 1159, 1166-67 (Ct. Int'l Trade 2016).

## ARGUMENT

### I. The Court should reject STAPIMEX's claims not raised in its complaint

In its exceptionally brief complaint, Plaintiff has raised only two counts: 1) a challenge to Commerce's rejection of Plaintiff's attempt to submit a revised Section C database after the preliminary determination, and 2) a challenge to Commerce's application of total AFA to STAPIMEX. *See* ECF 7 at 3 (Plaintiff's amended complaint).

In its Rule 56.2 brief, Plaintiff raises several challenges beyond the two identified in its complaint, including Commerce's determination that STAPIMEX failed to report FOPs as directed, Commerce's treatment of the warning produced by its preliminary margin program, and Commerce's preliminary calculations of larvae and frozen shrimp input costs. *See* Pl. Br., ECF 29 at 24-36, 39-43.

This Court has explained that

> Commerce's final determination in any antidumping proceeding is essentially immune to attack, except to the extent that a party commences a timely challenge of that final determination in this Court—and, even then, only to the extent of those specific issues that are raised in the complaint.

*Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1327 (Ct. Int'l Trade 2017) (citing 19 U.S.C. § 1516a(a)(1) (requiring the submission of a timely complaint to challenge a determination by Commerce)) and USCIT Rule 3(a)(2) (same requirement). *See also, e.g.*, *Pirelli Tyre Co. v. United States*, 539 F. Supp. 3d 1257, 1262 (Ct. Int'l Trade 2021) ("The scope of any litigation is confined to the issues raised in a plaintiff's complaint."); *Dexter Distribution Grp. LLC v. United States*, 747 F. Supp. 3d 1369, 1376 (Ct. Int'l Trade 2024) (refusing to consider an issue that "has not been properly challenged in this case").

Further, this Court has pointed out that a plaintiff's ability to later add new challenges that it had not included in its complaint "is narrowly circumscribed" by the rules of this Court. *Zhaoqing Tifo*, 256 F. Supp. 3d at 1327 n.12. USCIT Rule 15(a)(1) permits a party to amend its pleading once as a matter of course within the periods specified in that rule. In all other cases, Rule 15(a)(2) requires the opposing party's written consent or the Court's leave. Although Rule 15(a)(2) directs courts to give leave freely "when justice so requires," this Court has also explained that the decision to allow amendment lies within the discretion of the Court and must be balanced against considerations such as undue delay. *See, e.g.*, *Ford Motor Co. v. United States*, 896 F. Supp. 1224, 1229 (Ct. Int'l Trade 1995); *see also, e.g., Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 29 C.I.T. 1266, 1270 (2005) (refusing to allow a plaintiff to add a new issue to a case as "{w}hat is dispositive here is that, even after {the plaintiff} discovered the alleged error, {it} failed to promptly raise the issue in this action.").

Plaintiff was aware of all the issues now raised in its brief when it filed its amended complaint, having unsuccessfully raised those same issues before Commerce. More importantly, Plaintiff has not sought to amend its complaint either by consent of the parties or leave of the Court under Rule 15(a)(2), and therefore has not explained why its delay in raising these new claims—until well past the statutory time limit for challenging a Department of Commerce determination—is not undue. Unless Plaintiff's new claims are included in a complaint properly before this Court, this Court should decline to consider those challenges. *See, e.g.*, *Zhejiang Mach.*, 29 C.I.T. at 1273 ("failure to promptly raise the alleged error in this action is fatal….{and the challenge to that error} is therefore denied").

To the extent that this Court decides to allow Plaintiff to add counts to its complaint, we address Plaintiff's arguments below so that all issues are before the Court for its consideration as may be necessary.

## II. STAPIMEX fails to engage with the facts regarding its brokerage and handling reporting

### *A. STAPIMEX's arguments regarding its brokerage and handling reporting are irrelevant and unripe*

STAPIMEX incorrectly argues that Commerce's application of total AFA in the final determination was "regarding DMEBROKU information reported by STAPIMEX." Pl. Br., ECF 29 at 3. Commerce was clear that it applied total AFA in the final determination *not* because of the DMEBROKU issue, but because it lacked usable sales and FOP databases from STAPIMEX that it could have verified. *See*

Final IDM, P.R. 10 at 46 (Commerce applied total AFA because of "the reasons explained above regarding issues identified in STAPIMEX's Section C and Section D questionnaire responses….").

The deficiencies that led Commerce to apply partial AFA preliminarily to STAPIMEX's missing DMEBROKU reporting did not form the basis for Commerce's final determination. In the final results, Commerce did not calculate a DMEBROKU amount because it did not use DMEBROKU to determine STAPIMEX's dumping margin. As Commerce plainly explained, it set the final margin for STAPIMEX using a previously determined total AFA rate. *Id.* at 48. None of STAPIMEX's expenses, reported or unreported, was considered. STAPIMEX admits in its brief before this Court that Commerce would have moved to verification if the only issue had been STAPIMEX's failure to report DMEBROKU. Pl. Br., ECF 29 at 21. Despite that admission, STAPIMEX continues to claim throughout its brief that Commerce applied total AFA in the final determination because of the DMEBROKU issue. *See, e.g.*, *id.* at 22 (claiming that Commerce's treatment of the DMEBROKU issues is "costing STAPIMEX's *{sic}* millions of dollars in unwarranted dumping duties.").

Thus, STAPIMEX's arguments regarding whether Commerce's application of partial AFA in the preliminary determination was punitive are entirely irrelevant.

*See* Pl. Br., ECF 29 at 21-22.[4] As STAPIMEX itself states, "preliminary determinations are 'preliminary' precisely because they are subject to change." *Id.* at 22. Commerce simply did not apply that partial AFA in the final determination that STAPIMEX is challenging.

In its brief before this Court, STAPIMEX does not identify what relief it seeks on the DMEBROKU issue. STAPIMEX instead speculates about what Commerce might do if this Court were to remand the determination with instructions for Commerce not to apply total AFA. Pl. Br., ECF 29 at 23 ("Should the Court remand this case to Commerce…the question then arises as to what value should be used for DMEBROKU."). But this Court has not remanded this determination, and Commerce has not determined how it would address STAPIMEX's DMEBROKU reporting in a remand calculation. This Court has no final reasoning from the agency to review. STAPIMEX apparently wishes to have the Court decide the issue before Commerce does, rather than to review what Commerce has done. This Court must refuse to do so. *See, e.g.*, *Tianjin Magnesium Int'l Co. v. United States*, 32 C.I.T. 1, 23 (2008) (Commerce's non-final actions "are not ripe for judicial review before administrative adjudication has concluded").

*B. STAPIMEX's own admissions rebut its claim that its noncooperation was limited to mistakenly omitting a database field*

Even if Commerce's preliminary treatment of STAPIMEX's brokerage and

[4] In its brief, Plaintiff also states that the domestic industry is "clearly not entitled to duties on Canadian sales." Pl. Br., ECF 29 at 20. What Plaintiff is referring to in this argument is baffling.

handling reporting were relevant to the challenged final determination or ripe for judicial review, STAPIMEX provides no basis to disturb that treatment.

STAPIMEX claims that it "made only one mistake: not supplying one very minor field of information, DMEBROKU." Pl. Br., ECF 29 at 19. That claim is demonstrably untrue. As set out in the statement of the facts above, Commerce faulted STAPIMEX not only for repeatedly omitting the DMEBROKU field from its databases, but also for failing to provide the supporting documentation Commerce requested for those expenses. *See* P.R. 84 (preliminary IDM) at 7. Indeed, in its opening brief to this Court, STAPIMEX *finally* acknowledges Commerce's *complete* supplemental question on this issue, which, in part c, directed STAPIMEX to provide documentation for two specific invoices. Pl. Br., ECF 29 at 14. And STAPIMEX finally admits that it did not respond at all to this question. *Id.* STAPIMEX claims that somehow that question "evaporated" from Commerce's questionnaire when STAPIMEX went to answer the questions. *See id.* at 15-16. But, as the record in this case clearly shows, Commerce presented that question to STAPIMEX. *See* P.R. 116 at 7 (Commerce's supplemental C questionnaire).

STAPIMEX makes no argument that a respondent is excused from answering Commerce's questions in full because the question allegedly "evaporated" while the respondent was preparing its response. *See* Pl. Br., ECF 29 at 16. Instead, STAPIMEX points to other documentation it placed on the record and argues that Commerce could have used that documentation to calculate the missing DMEBROKU amounts as "neutral facts available." *See id.* at 2, 5, 17.

While STAPIMEX may have intended to respond to part of Commerce's supplemental question (and failed even at that), a respondent cannot pick and choose which parts of Commerce's requests it will respond to and ignore the rest if it hopes to avoid being found less than *fully* cooperative and so subject to the application of AFA. Even if Commerce had accepted STAPIMEX's eventual submission of what STAPIMEX claims to be the correct DMEBROKU reporting in the database, STAPIMEX's failure to provide the specific documentation Commerce requested to support its reporting would still itself support Commerce's application of AFA on this issue. STAPIMEX never attempted to provide the documentation for the two specific invoices Commerce requested during the agency's proceeding; it has only argued that Commerce should ignore the request that it made and look instead at what information STAPIMEX decided to supply in its place. But "{i}t is Commerce, not the respondent, that determines what information is to be provided." *Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198, 205 (Ct. Int'l Trade 1986). And "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with *full and complete answers* to *all* inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

STAPIMEX claims that Commerce, having discovered the missing DMEBROKU information, should have stepped into STAPIMEX's shoes and calculated the missing figures on behalf of STAPIMEX. *See* Pl. Br. at 5. Indeed,

STAPIMEX even argues that "the Court may add something" in those calculations to account for STAPIMEX's now-admitted failure to cooperate fully. *Id.* But neither Commerce nor the Court is required to assume STAPIMEX's reporting burden and remedy STAPIMEX's incomplete reporting for STAPIMEX's benefit. "'{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce,'" and certainly not with the Court. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992)); *see also, e.g.*, *Shandong Rongxin Imp. & Exp. Co. v. United States*, 355 F. Supp. 3d 1365, 1374 (Ct. Int'l Trade 2019) ("respondents are primarily responsible for the state of the record").

Thus, even if the brokerage and handling issue were relevant here or had played any role in Commerce's final determination—other than to highlight the breadth of STAPIMEX's noncooperation throughout the review—STAPIMEX provides no basis for this Court to do anything other than affirm Commerce's application of AFA to STAPIMEX's multiple failures to cooperate.

### *C. Commerce was not required to accept STAPIMEX's attempts to provide the data only after the preliminary determination*

STAPIMEX next argues that Commerce's refusal to allow STAPIMEX to submit a sales database that STAPIMEX claimed would contain the correct DMEBROKU reporting was an abuse of the agency's discretion and that Commerce is required to allow respondents to correct "clerical errors." Pl. Br., ECF 29 at 20-21. But STAPIMEX's argument here is premised on STAPIMEX's demonstrably

incorrect claim that it made only "one mistake." *Id.* at 19, 21. As already shown above, even STAPIMEX is forced to admit that its failures went beyond the missing DMEBROKU field and included STAPIMEX's "evaporation" of Commerce's full question and failure to provide the supporting documentation Commerce requested.

STAPIMEX's claim that it "is allowed one mistake" (a claim made with no support) is further refuted by the fact that Commerce had already allowed STAPIMEX to correct "one mistake," *i.e.,* to resubmit its supplemental section C response after STAPIMEX had missed the deadline for that response. *See, e.g.*, P.R. 10 (Final IDM) at 40. Even STAPIMEX cannot claim that Commerce is required to give a respondent unfettered opportunities to "fix mistakes" whenever the respondent decides it is expedient.

Moreover, a respondent must do "the maximum it is able to do" to meet the statutory "best of its ability" standard. *Nippon Steel*, 337 F.3d at 1383. *See also id.* at 1382-83 (a failure to cooperate includes both "(a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records."). Indeed, in the seminal case on the standard for noncooperation, *Nippon Steel,* the Federal Circuit addressed an instance parallel to that here: where a respondent failed to provide information Commerce sought until after Commerce preliminarily applied AFA. *Nippon Steel*, 337 F.3d at 1378. When the respondent then tried to provide that information (three days after being assigned AFA), the Federal Circuit upheld Commerce's rejection of the information as untimely and its application of AFA in the final

determination based on the respondent's failure to cooperate. *Id.* at 1383-84. *See also, e.g.*, *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("Because {the respondent} did not timely file the information, Commerce chose not to accept it {when the information was offered later by the respondent}, and instead upheld its application of adverse facts against {the respondent} in its final results.... Commerce's decision to apply adverse facts was supported by substantial evidence."); *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) ("The operative point is that {the respondent} possessed information that Commerce requested in its Questionnaire, and upon being asked to provide that information with supportive details and explanations, {the respondent} did not provide it. Such behavior cannot be considered maximum effort to provide Commerce with full and complete answers." (cleaned up)).

Like the respondent in *Nippon Steel*, STAPIMEX was not seeking an allowable "correction" of erroneous data. In neither case did the respondent discover it had made a mistake in its reporting and then reach out to Commerce to correct that mistake: both respondents attempted to remedy their reporting failures only after learning that Commerce had applied AFA. As has been pointed out in multiple court decisions, cases addressing the correction of genuine mistakes "are inapplicable here because they do not involve a failure to cooperate" or the application of AFA. *Papierfabrik Aug. Koehler SE v. United States*, 7 F. Supp. 3d 1304, 1313 (Ct. Int'l Trade 2014), *aff'd*, 843 F.3d 1373 (Fed. Cir. 2016); *see also Kisaan Die Tech Priv. Ltd. v. United States*, 665 F. Supp. 3d 1364, 1374 (Ct. Int'l

Trade 2023), *reconsideration denied sub nom. Chandan Steel Ltd. v. United States*, 729 F. Supp. 3d 1357 (Ct. Int'l Trade 2024) ("Neither case is on point. *Timken Corp*. and *NTN Bearing Corp*. did not involve the use of facts otherwise available or adverse inferences. Both involved situations in which a respondent brought an error to the Department's attention."); *cf.* Pl. Br., ECF 29 at 20 (relying on *NTN*). Those cases addressed the submission of *corrective* information. *See, e.g., Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1361–62 (Ct. Int'l Trade 2021). Courts have therefore "noted the differences between the submission of 'corrective information' and untimely new factual information." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1346 (Ct. Int'l Trade 2021).

By definition, to be *corrective*, the new information being proffered needs to *correct* some information already on the record, or else it is simply untimely new information. *See id.* Information is not corrective where the respondent did not seek to "correct a mistaken previous submission, but instead attempted to fill the gap caused by failure to provide a questionnaire response…." *Fischer S.A. Comercio, Industria & Agricultura v. United States*, 34 C.I.T. 334, 349 (2010). *See also Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549, 555 (2013) (following the distinction in *Fischer* between untimely factual submissions intended to fill a gap caused by a prior failure to respond and corrective information). It is simply new information offered for the first time past the deadline set by Commerce.

Because STAPIMEX's post-preliminary submission did not correct

information already on the record, was not its first opportunity to remedy a reporting failure, and would not have supplied the missing supporting documentation, Commerce's rejection of that untimely submission was neither unreasonable nor an abuse of discretion. Nor did that rejection ultimately play any role in Commerce's final determination, as Commerce based the final application of total AFA on the additional, far broader reporting deficiencies Commerce subsequently discovered. STAPIMEX fails to raise any meaningful argument on this point and fails to support its immaterial claims with the facts. The Court must reject all of STAPIMEX's claims regarding these issues.

## III. STAPIMEX's arguments regarding Commerce's application of total AFA ignore basic facts on the record and Commerce's explanations

STAPIMEX's arguments that do address the determination Commerce did make in the challenged review fare no better. Here too, STAPIMEX's claims repeatedly fail to acknowledge, much less meaningfully engage with, the facts before the agency and what Commerce actually determined. Lacking any factual basis for its claims, STAPIMEX again provides no basis for this Court to disturb Commerce's determination.

### *A. STAPIMEX disregards the fact that Commerce specifically instructed STAPIMEX to report FOPs on a CONNUM-specific basis*

In its opening brief before this Court, STAPIMEX insists that "there is not even a scintilla of evidence" that Commerce had directed STAPIMEX to report its FOPs on a CONNUM-specific basis or that STAPIMEX in any way failed to follow the instructions that Commerce had given. Pl. Br., ECF 29 at 26, 31, 36-37, etc.

STAPIMEX attempts to substantiate that assertion through extensive block quotations from Commerce's section C questionnaire. *Id.* at 27-30.

STAPIMEX does not explain why it expects any instructions on FOP reporting to appear in Commerce's section C questionnaire. Section C of Commerce's questionnaire did not involve FOP reporting. It sought information on U.S. *sales*. P.R. 200 at 28 (C-1: "SECTION C," "This section of the questionnaire provides instructions for reporting your sales of the merchandise under consideration in or to the United States."). Commerce's instructions for reporting production and FOPs were in *section D*. *Id.* at 62 (D-1: "SECTION D," "This section of the antidumping questionnaire instructs you on how to report the **factors of production** (factors) of the merchandise under consideration," emphasis in the original).

Consistent with its longstanding requirement for CONNUM-specific FOP reporting, discussed above, Commerce *explicitly* instructed STAPIMEX to report FOPs on that basis. That precise instruction is worth repeating here:

> E. Reporting Factors of Production
>
> If you are not reporting factors of production (FOPs) using actual quantities consumed to produce the merchandise under review *on a CONNUM-specific basis*, please provide a detailed explanation of all efforts undertaken to *report the actual quantity of each FOP consumed to produce the merchandise under review on a CONNUM-specific basis*. Additionally, please provide a detailed explanation of how you derived your estimated FOP consumption for merchandise under review *on a CONNUM-specific basis* and explain why the methodology you selected is the best way to accurately demonstrate an accurate consumption amount. For the most significant material input, for

> electricity, and for labor, please reconcile with worksheets the estimated consumption of these FOPs for a specific CONNUM to your cost-of-production (COP) ledger or the equivalent production ledger.

*Id.* at 63 (D-2; emphasis added).

STAPIMEX's response to that instruction directly contradicts its claim that Commerce never required CONNUM-specific FOP reporting. STAPIMEX first repeated *verbatim* the exact instruction quoted above and then averred that "*{w}e have reported FOPs as requested*, using actual data maintained by Stapimex *{sic}* in its accounting system." P.R. 161 (STAPIMEX's section D response, emphasis added) at 246 (D-3). As set out in Commerce's final decision memorandum, Commerce then repeated that instruction for CONNUM-specific reporting a number of times during the review. STAPIMEX indicated that it had followed those instructions. *See* Final IDM, P.R. 10 at 42-43.

Thus, the record is perfectly clear that Commerce had directed STAPIMEX to report FOPs on a CONNUM-specific basis and STAPIMEX had claimed to the agency that it had followed those instructions. STAPIMEX's continued denial of those facts cannot be reconciled with its own questionnaire response. *See* Pl. Br., ECF 29 at 30-31.

STAPIMEX points to Exhibit C-7 of its original *sales* response because, STAPIMEX apparently believes, a deep enough dive into that exhibit would have revealed to Commerce that STAPIMEX's *FOP* reporting was not on a CONNUM-specific basis. There are two flaws in STAPIMEX's claim. First, the fact that this exhibit showed "a complete listing of connums *{sic}*, a description of each product

associated with each connum *{sic}*, and the product code associated with each connum *{sic}*" would not establish that STAPIMEX reported FOPs by product code rather than by CONNUM. It would only show what CONNUMs STAPIMEX used in its sales reporting. More importantly, STAPIMEX fails to point to any authority that would require Commerce to unravel a respondent's reporting to determine whether the reporting conformed to the respondent's express representations.

The burden is not on Commerce to correct the record for the respondent. The burden is on the respondent to follow Commerce's reporting instructions. 19 U.S.C. § 1677e(a)(2)(B) (a respondent is required to provide Commerce with the information "in the form and manner requested"). *See also Hung Vuong*, 483 F. Supp. 3d at 1360-61 (a failure to report FOPs on a CONNUM-specific basis after having been instructed to do so is a failure to cooperate fully with Commerce's instructions that justifies applying AFA).[5]

Because STAPIMEX failed to provide the requested FOP data in the form and manner Commerce specified despite expressly representing that it had complied, Commerce was fully authorized under the statute to reject STAPIMEX's undisclosed alternative reporting when Commerce discovered it late in the review.

---

[5] In *Hung Vuong*, the Court also noted that though 19 U.S.C. § 1677m(c)(1) allows a respondent to seek to have Commerce modify reporting requirements such as CONNUM-specific reporting, the statute requires that the respondent seek Commerce's permission first and does not allow the respondent to unilaterally change the reporting basis. 483 F. Supp. 3d at 1361. As with the respondent in *Hung Vuong*, STAPIMEX neither sought Commerce's approval before adopting a different reporting basis nor disclosed that departure before Commerce discovered it.

*See* 19 U.S.C. § 1677e(a)(2)(B).

*B. STAPIMEX's claims regarding Commerce's detection of undisclosed changes in STAPIMEX's sales reporting are speculative and ignore Commerce's actual explanations*

STAPIMEX also fails to meaningfully engage with the agency record regarding Commerce's rejection of STAPIMEX's sales (section C) database. As set out in the statement of the facts above, when STAPIMEX attempted to untimely submit a new section C database following Commerce's preliminary application of partial AFA, Commerce looked into the claims that STAPIMEX made in an attempt to excuse the untimely submission. As STAPIMEX claimed that its consultant erroneously had submitted the *original* section C database with the supplemental response, Commerce compared the database submitted with the supplemental response against the originally submitted database to determine whether they were identical. They were not. P.R. 10 (Final IDM) at 38-40.

STAPIMEX states that "{w}e believe that Commerce erroneously compared the June 20 database to the original Section C database…." Pl. Br., ECF 29 at 23. STAPIMEX provides no factual basis for that belief. STAPIMEX states only that the "original database had a file name of stapus01.sas7bdat." STAPIMEX does not explain how the original database's file name establishes which databases Commerce compared. *Id.*

STAPIMEX ignores that, when STAPIMEX raised this same mistaken comparison claim before Commerce, Commerce explained in detail why STAPIMEX's belief is erroneous. Commerce explained to STAPIMEX that the

agency "did not compare STAPIMEX's post-preliminary database to anything on the record, and did not cite such a comparison as a reason to cancel verification." P.R. 10 (Final IDM) at 39. Commerce specified that what it *had* compared were the "originally submitted U.S. sales database" and the "supplemental Section C database." *Id.* "Commerce never compared any database on the record to the post-preliminary Section C database that STAPIMEX attempted to submit, because that submission was rejected as untimely and unsolicited." *Id.*

STAPIMEX's unsupported belief that Commerce compared databases other than those it identified "is the very soul of speculation." *Am. Tubular Prods., LLC v. United States*, No. 13-00029, 2015 WL 5236010, Slip Op. 15-98 at *9 (Ct. Int'l Trade Aug. 28, 2015), *aff'd*, 847 F.3d 1354 (Fed. Cir. 2017) ("Speculative claims that are plausible in theory but unsupported in fact do not make the cut."). "Such speculation cannot constitute substantial evidence." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1361 (2001); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute substantial evidence;" quotation marks removed).

As Commerce explained, STAPIMEX's unclear and inconsistent descriptions of its database submissions prevented Commerce from reliably identifying which reported information—and which undisclosed changes—each database contained. *See* P.R. 10 (Final IDM) at 40. Commerce may properly reject such inconsistent databases containing unexplained changes when they are discovered, particularly when they are discovered late in Commerce's process leaving insufficient time for

further agency examination. *See, e.g.*, *Severstal Exp. GmbH v. United States*, 374 F. Supp. 3d 1368, 1374 (Ct. Int'l Trade 2019); *China Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1340 (Ct. Int'l Trade 2019).

*C. Lacking correct and reliable sales and FOP data, Commerce properly canceled verification*

STAPIMEX argues that Commerce improperly rejected its sales and FOP databases and therefore improperly canceled verification and applied total AFA. *See* Pl. Br., ECF 29 at 33-38. STAPIMEX also claims that there was no "missing information" from the record due to STAPIMEX's reporting of FOPs on a different basis than Commerce instructed. *Id.* at 36-37. STAPIMEX is again incorrect on both counts.

First, STAPIMEX again ignores that Commerce addressed STAPIMEX's "no missing data" argument and explained specifically which data were missing. Commerce explained that STAPIMEX's reporting of multiple product codes with the same CONNUM and different FOPs meant that the database lacked properly weight-averaged FOPs for each CONNUM. P.R. 10 (Final IDM) at 41-42. Commerce needed those CONNUM-specific data to be able to fairly compare the costs of production to STAPIMEX's U.S. sales prices. *Id.* Commerce also explained why STAPIMEX's proposed modifications would not have fixed the problem. *Id.*

As noted above, the statute requires that a respondent submit the data Commerce seeks "in the form and manner requested," not in the form and manner the respondent finds convenient or preferable for its own purposes. 19 U.S.C. § 1677e(a)(2)(B). Commerce was not required to determine whether the data

STAPIMEX submitted could be unraveled and reconstructed to meet Commerce's needs. "{T}he burden of creating an adequate record lies with" the respondent. *QVD Food*, 658 F.3d at 1324.

The Federal Circuit has rejected arguments nearly identical to STAPIMEX's, where a respondent claimed surprise at being required to comport with Commerce's long-standing CONNUM practice, after first having asserted to Commerce that it had followed those reporting instructions, and argued that the FOP it instead had submitted on its own allocation basis was sufficient for Commerce's needed. *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 103, 109 (Fed. Cir. 2022). There, the Federal Circuit affirmed this Court's holding that Commerce's application of total AFA in response to the lack of CONNUM-specific reporting as it had directed, stating that "{b}ecause of the importance of the information requested, Commerce was entirely reasonable to expect more accurate and responsive answers to the questionnaire." *Id.* at 110 (quotation marks omitted). *See also, Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307–08 (Fed. Cir. 2014) (affirming the application of total AFA when a respondent failed to report its data allocated on the basis requested by Commerce, as such a failure results in "submissions {that are} so incomplete that they could not be used without undue difficulty.").

In the review under review here, Commerce was also reasonable in canceling verification of STAPIMEX's reporting when Commerce discovered, shortly before the scheduled verification, that the databases on the record did not conform to STAPIMEX's descriptions of its reporting. "{V}erification is like an audit, the

purpose of which is to test information *provided by a party* for accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990) (emphasis added); *see also Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1344 (Fed. Cir. 2021) ("Verification represents a point of no return. The purpose of verification is 'to test information provided by a party for accuracy and completeness;'" quoting *Bomont*). . Verification does not require Commerce to attempt to reconstruct data that the respondent failed to report in the requested form and manner and then determine if that reconstructed data can be verified. Where a respondent "did not meet their preliminary burden of creating an adequate record," "Commerce was under no duty to conduct verification of such information." *Tianjin Mach.*, 806 F. Supp. at 1015.

Here again, STAPIMEX gives the Court no legitimate reason to disturb Commerce's action. Commerce has explained exactly why it rejected STAPIMEX's reporting and STAPIMEX's disregard of those explanations does not establish error by Commerce.

*D. STAPIMEX ignores the fact that Commerce directly addressed STAPIMEX's claims about the program warning*

STAPIMEX claims that Commerce "intentionally ignored the 'WARNING' in its SAS program" and that Commerce has never addressed that programming issue. Pl. Br. at 25, 31-32. Again, STAPIMEX's claims here are both irrelevant and factually wrong.

Once again, STAPIMEX's attacks on Commerce's *preliminary* calculations are entirely irrelevant to the determination STAPIMEX is challenging; Commerce

did not apply any of those calculations in the final determination of STAPIMEX's dumping margin. Commerce applied a total AFA rate because it had rejected STAPIMEX's sales *and* FOP reporting. What Commerce may have done had STAPIMEX actually been cooperative and provided the data Commerce needed is neither known nor relevant. This Court reviews what Commerce did, not what a party may theorize Commerce might have done.

Further, STAPIMEX's claim that Commerce has not addressed this issue is also factually incorrect. Commerce did exactly that in response to STAPIMEX's claims to the agency. In its final decision memorandum, Commerce provided the exact warning language produced by its program and explained that this warning indicated only that product codes of different lengths had been reported in STAPIMEX's *sales* database and that long codes could be truncated by the program. It did "not have anything to do with STAPIMEX's FOP database or the merge of the database" as STAPIMEX argued, nor would the truncation issue affect the margin calculation. P.R. 10 at 44-45. Following that warning was a note from the program that the database had "more than one data set with repeats of BY values:" *i.e.*, the database had multiple rows where the same CONNUM (the "BY" value the program was attempting to match to the sales in the sales database) appeared with different FOPs. *That* was the issue that alerted Commerce to the problem with STAPIMEX's FOP database and led to Commerce's discovery that STAPIMEX's claim to have followed Commerce's reporting instructions was not true. *Id.* at 45. STAPIMEX's claim that Commerce failed to address the program warning is both factually

incorrect and irrelevant to the final determination.

In sum, because STAPIMEX fails repeatedly to address the actual facts of this case and those unacknowledged facts are fatal to STAPIMEX's claims, this Court has no reason to accept STAPIMEX's arguments.

## IV. Because Commerce properly applied total AFA to STAPIMEX, STAPIMEX's remaining arguments are futile

STAPIMEX ends its opening brief with claims that Commerce made errors in its preliminary calculations regarding the valuation of various shrimp inputs. Pl. Br., ECF 29 at 39-43. STAPIMEX points out that it raised these issues in a post-preliminary letter to Commerce, which STAPIMEX purports to incorporate into its brief by reference. *Id.* at 39. STAPIMEX argues that Commerce "has no discretion" and must fix these errors, along with what STAPIMEX claims is the "warning" error. *Id.* at 43.

Even if it is assumed that the preliminary calculations contained the alleged errors, those errors did not affect the final determination because Commerce did not use those calculations in the final results. Commerce was clear on that point: "{i}f Commerce were calculating a rate for STAPIMEX, we would have addressed the alleged ministerial errors herein." P.R. 10 (Final IDM) at 49.

STAPIMEX quotes various court decisions in support of its position, but ignores that those decisions address *final* Commerce determinations, not preliminary calculations that were never applied in a final determination. *See, e.g.*, Pl. Br., ECF 29 at 41 (quoting *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292 (Fed. Cir. 2003) for the proposition that Commerce should

correct obvious errors "from the final determination;" emphasis added by Plaintiff). STAPIMEX points to no authority requiring Commerce to correct errors it did not make in a final determination. *See id.* at 40-44. Indeed, what relief STAPIMEX seeks from the Court on this point is, once again, entirely unclear. Even if the Court ordered Commerce to correct what STAPIMEX claims were errors in the preliminary calculations, Commerce's final determination would remain unchanged as those calculations played no role in the final determination. Even if this Court had grounds to reject Commerce's final application of total AFA to STAPIMEX and require that Commerce instead calculate a final margin, whether Commerce would perform the same calculations STAPIMEX challenges is entirely speculative. This Court cannot review an imaginary agency determination for substantial evidence or compliance with law. "In particular, a federal court does not have the power to render an advisory opinion on a question simply because it may have to face the same question in the future." *Verson, a Div. of Allied Prods. Corp. v. United States*, 22 C.I.T. 151, 153–54 (1998) (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, ASPA respectfully requests that this Court deny STAPIMEX's motion for judgment on the agency record and sustain Commerce's final results.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Elizabeth J. Drake
Nicholas J. Birch
**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel for Defendant-Intervenor American Shrimp Processors Association*

Dated: October 22, 2026

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Schagrin Associates hereby certifies that the Response Brief of Defendant-Intervenor American Shrimp Processors Association, dated October 22, 2026, complies with the word-count limitation set out in the standard chambers procedures of this Court, limiting response briefs to 14,000 words. This response brief contains 7,554 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Nicholas J. Birch
Roger B. Schagrin
Elizabeth J. Drake
Nicholas J. Birch
**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel for Defendant-Intervenor American Shrimp Processors Association*

Dated: October 22, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX),<br>*Plaintiff,*<br>v.<br>UNITED STATES,<br>*Defendant,*<br>*and*<br>AD HOC SHRIMP TRADE ACTION COMMITTEE, and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>*Defendant-Intervenors.* | **Court No. 26-02435** |

**PROPOSED ORDER**

Upon consideration of Plaintiff's motion for judgment on the agency record in this action, Defendant's and Defendant-Intervenors' responses, and upon consideration of all other pertinent papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's motion is **DENIED**; and it is further

**ORDERED** that the final results of the Department of Commerce challenged in this action are sustained.

**SO ORDERED.**

____________________________________
RICHARD K. EATON, JUDGE

Dated: __________________, 2026
New York, New York