**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: The Honorable Richard K. Eaton, Judge**

| | |
|---|---|
| **SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX),**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,**<br><br>**Defendant-Intervenors.** | **Court No. 26-02435** |

***PROPOSED JUDGMENT***

This case, having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED, and DECREED** that the U.S. Department of Commerce's determination published as *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,429 (Dep't Commerce Feb. 23, 2026) is sustained; and it is further

**ORDERED** that judgment is entered for Defendant United States.

____________________ ________________________________________
Date The Honorable Richard K. Eaton, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: The Honorable Richard K. Eaton, Judge**

| | |
|---|---|
| **SOC TRANG SEAFOOD JOINT STOCK COMPANY (STAPIMEX),**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,**<br><br>**Defendant-Intervenors.** | **Court No. 26-02435** |

**RESPONSE BRIEF OF THE AD HOC SHRIMP TRADE ACTION COMMITTEE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Nathaniel Maandig Rickard
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Avenue NW
Suite 700
Washington, DC 20036

*Counsel to Defendant-Intervenor the Ad Hoc Shrimp Trade Action Committee*

October 22, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STATEMENT PURSUANT TO RULE 56.2 ..... 1

A. The Administrative Determination Under Review ..... 1

B. Issues of Law Presented for Review and Summary of Arguments ..... 2

STATEMENT OF FACTS ..... 4

STANDARD OF REVIEW ..... 9

ARGUMENT ..... 9

I. Commerce's Application of Total Adverse Facts Available to STAPIMEX Is Supported by Substantial Evidence and In Accordance with Law ..... 9

A. Legal Standard Governing Commerce's Use of Facts Available and Adverse Inferences ..... 10

B. Substantial Evidence Supports Commerce's Application of Facts Otherwise Available with an Adverse Inference ..... 11

1. STAPIMEX's Arguments Fail to Engage with the *Final Results* ..... 11

2. Commerce Reasonably Determined that Information Necessary to Calculating a Dumping Margin Was Missing from the Record ..... 12

3. Commerce Reasonably Concluded that STAPIMEX Failed to Cooperate by Not Acting to the Best of Its Ability ..... 17

4. Commerce's Selection of the 25.76 Percent AFA Rate Is in Accordance with Law ..... 18

II. The Court Should Decline to Consider STAPIMEX's Arguments Regarding Commerce's Preliminary Margin Program ..... 19

A. Relevant Factual Background ..... 20

B. The Court Should Reject as Moot STAPIMEX's Challenges to Commerce's Preliminary Margin Calculation ..... 21

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. United States*,
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ..... 17

*Celik Halat ve Tel Sanayi A.S. v. United States*,
503 F. Supp. 3d 1241 (Ct. Int'l Trade 2021) ..... 2

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ..... 9

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ..... 9

*Deacero S.A.P.I. de C.V. v. United States*,
353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ..... 21

*Dillinger France S.A. v. United States*,
651 F. Supp. 3d 1294 (Ct. Int'l Trade 2023) ..... 18

*Dongkuk S&C Co. v. United States*,
134 F.4th 1320 (Fed. Cir. 2025) ..... 9

*FTC v. Standard Oil Co. of California*,
449 U.S. 232 (1980) ..... 2

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ..... 16

*Kisaan Die Tech Priv. Ltd. v. United States*,
665 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ..... 22

*KYD, Inc. v. United States*,
607 F.3d 760 (Fed. Cir. 2010) ..... 19

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ..... 9

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) ..... 18

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ..... 11

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990) ..... 10

*Shakeproof Assembly Components v. United States*,
268 F.3d 1376 (Fed. Cir. 2001) ........ 18

*Thuan An Production Trading & Service Co. v. United States*,
348 F. Supp. 3d 1340 (Ct. Int'l Trade 2018) ........ 15

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ........ 9

## Statutes

19 U.S.C. § 1516a ........ 9, 11, 20

19 U.S.C. § 1677e ........ 10, 11, 19

19 U.S.C. § 1677m ........ 16

## Administrative Determinations

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,429 (Dep't Commerce Feb. 23, 2026) ........ *passim*

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results, Notice of Intent To Rescind, in Part, and Final Rescission, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 24,583 (Dep't Commerce June 11, 2025) ........ 5, 10, 20

*Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From the Socialist Republic of Vietnam*, 69 Fed. Reg. 71,005 (Dep't Commerce Dec. 8, 2004) ........ 21

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024) ........ 4

## INTRODUCTION

Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("Domestic Producers" or "AHSTAC") opposes the motion for judgment on the agency record filed by Plaintiff Soc Trang Seafood Joint Stock Company ("Plaintiff" or "STAPIMEX"). *See* Mem. of P. & A. in Support of Mot. for J. on the Agency R. Pursuant to Rule 56.2, Aug. 14, 2026 ("Pl. Br."), ECF 29-1.[1] Because STAPIMEX's claims are without merit, the Court should sustain the underlying agency determination and enter judgment for Defendant United States.

## STATEMENT PURSUANT TO RULE 56.2

### A. The Administrative Determination Under Review

STAPIMEX challenges certain aspects of the determination issued by the U.S. Department of Commerce ("Commerce") to conclude the nineteenth administrative review of the

---

[1] Plaintiff's brief in support of its motion for judgment on the agency record does not claim to include any business proprietary information. Plaintiff appears, however, to have erroneously redacted text appearing between brackets in quotations from judicial decisions in its brief. For example, on pages 7 and 19 of its brief, Plaintiff quotes from the CIT's decision in *Diversified Products* but redacts the word "its," seemingly because the word appears in brackets indicating alterations within quotations in the CIT's opinion. *See* Pl. Br. 7, 19. At the same time, other text appearing in brackets altering quoted language on pages 7 ("S"), 19 ("S"), and 41 ("ical") were not redacted. *See id.* at 7, 19, 41. Moreover, inexplicably, although Plaintiff cites to a public document (P.R. 116, mis-dated in Plaintiff's brief as March 27, 2025 but actually issued on March 7, 2025) as the source for a block quote of a series of questions addressed to STAPIMEX, Plaintiff includes information within brackets at page 15 of its brief that was redacted and does not appear in that public document. *See id.* at 14-15.

Similar errors caused by inattention to detail appear elsewhere in Plaintiff's brief. These mistakes include block quoting text from judicial decisions without any indication that these are quotes, as well as letters appearing in highlighted text for no apparent reason and paragraph breaks in the middle of sentences. *See id.* at 20 (discussing actions by "NTN"); at 5 (highlighting in yellow the "p" in per pound); *id.* at 12 (highlighting in yellow a blank space before the start of a paragraph); *id.* at 14 (highlighting in yellow a blank space and a period appearing in "P.R."); *id.* at 15 (highlighting in yellow multiple periods); *id.* at 7 (paragraph break between "pronouncements," and "and"); and *id.* at 8 (paragraph break between "*Indus.*" and "*Corp.*").

antidumping duty order on certain frozen warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam"). *See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results of and Final Rescission of Review, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 8,429 (Dep't Commerce Feb. 23, 2026) ("*Final Results*"), P.R. 9.[2] The factual findings and legal conclusions upon which Commerce's determination is based are set out primarily in the "Issues and Decision Memorandum" accompanying the final results.[3] *See* Issues and Decision Memorandum for the Final Results of the 2023-2024 Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam (Feb. 17, 2026) ("IDM"), P.R. 10.

**B. Issues of Law Presented for Review and Summary of Arguments**

STAPIMEX challenges Commerce's determination with respect to the following

[2] This brief cites only information on the public administrative record. However, citations are provided to both the public and confidential records using the "C.R." and "P.R." document numbers from the record indices filed with the Court. *See* Index to the Administrative Record, May 4, 2026, ECF 22. Domestic Producers note that the document numbers from the record indices appear in reverse chronological order (i.e., with the first record document on the public index identified as P.R. 283).

[3] Plaintiff's brief makes numerous references to errors allegedly committed in Commerce's preliminary determination. *See*, *e.g.*, Pl. Br. at 1 ("Commerce committed certain errors in the preliminary results that should be corrected . . . ."); *id.* at 2 (arguing that "certain clerical errors made by Commerce in the preliminary results should be corrected"); *id.* at 6 ("Commerce made several errors in its calculations performed for the preliminary results."). These references to the preliminary results seem to stem from Plaintiff copy-and-pasting large portions of its brief from the written arguments filed at the agency level. *See* Letter from STAPIMEX to Commerce, re: *STAPIMEX Case Brief* (Nov. 14, 2025) ("STAPIMEX Case Brief"), C.R. 6, P.R. 34. By rote repetition of its agency case brief, Plaintiff's brief to this Court largely fails to frame the issues against the operative standards of review or otherwise engage with the explanation supplied by Commerce in the IDM. Regardless, it is well-settled that once a preliminary determination merges into a final determination, only the final determination is reviewable by the court. *See Celik Halat ve Tel Sanayi A.S. v. United States*, 503 F. Supp. 3d 1241, 1248 (Ct. Int'l Trade 2021) ("*Celik*") (citing *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 246 (1980)).

issues:

**1) Whether Commerce's decision that necessary information was missing from the record and its ensuing use of an adverse inference in selecting from among the facts otherwise available was supported by substantial evidence and otherwise in accordance with law.**

Yes, Commerce reasonably concluded that necessary information was missing from the record with respect to STAPIMEX and that the use of an adverse inference in selecting from among the facts otherwise available ("AFA") was appropriate because the respondent failed to act to the best of its ability over the course of the review by not responding fully to Commerce's requests for information and by providing information that was unverifiable and unusable. Specifically, despite multiple requests for information regarding the respondent's market economy brokerage and handling expenses, STAPIMEX did not include this information in its U.S. sales database. STAPIMEX's belated attempt to submit a new U.S. sales database after the preliminary results does not excuse its failures, as the information was requested by Commerce on multiple occasions. Commerce's use of total AFA is further supported by STAPIMEX's misreporting of its factors of production ("FOP") information that rendered its Section D database unusable. Thus, the record refutes STAPIMEX's claim that its conduct over the course of the administrative review "was virtually perfect" with "only one mistake," *see* Pl. Br. 6, and instead shows repeated failures by the company to submit information requested by Commerce, as well as inattentiveness and carelessness on the part of the respondent.

**2) Whether Commerce "made errors in its calculations in the preliminary results" that should have been "corrected in the final results."**

No, Commerce correctly explained that arguments concerning certain surrogate values in STAPIMEX's margin calculation in the preliminary results "are moot" because of the agency's decision to assign the company a rate based entirely on AFA. STAPIMEX provides no argument for why the Court should consider disputes challenging calculations made only in the

preliminary results. Because Commerce's decision to apply total AFA to STAPIMEX was supported by substantial evidence and otherwise in accordance with law, the Court should conclude that the margin calculation issues argued by STAPIMEX are moot because they have no bearing on the ultimate dumping margin assigned to the company in the final results.

**STATEMENT OF FACTS**

On April 9, 2024, Commerce initiated its nineteenth administrative review of the antidumping duty order on certain frozen warmwater shrimp from Vietnam in response to review requests received from interested parties. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024), P.R. 270. Commerce's review covered the period from February 1, 2023 to January 31, 2024 (the "POR"). *Id.* at 24,787. Thereafter, Commerce selected STAPIMEX and Thong Thuan Company Limited ("Thong Thuan"), the two companies under review that accounted for the largest volume of subject merchandise, for individual review as mandatory respondents.[4] Commerce Memorandum, re: *Respondent Selection* (July 18, 2024), C.R. 357, P.R. 192.

Following its selection as a mandatory respondent, STAPIMEX submitted responses to Commerce's initial questionnaire from August to September 2024. *See* Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam; 2023-2024 (June 5, 2025) ("PDM"), at 2 (citations omitted), P.R. 85. Based on STAPIMEX's initial responses, Commerce issued the respondent supplemental questionnaires seeking further information between November 2024 and May 2025. *Id.* at 2-3 (citations omitted).

---

[4] Thong Thuan also filed an action challenging the *Final Results*. *See* Compl., *Thong Thuan Co. v. United States*, No. 26-02456 (Ct. Int'l Trade Apr. 22, 2026), ECF 12. The two appeals have not been consolidated.

On June 11, 2025, Commerce published its preliminary determination in which it calculated a weighted-average dumping margin of 35.29 percent for STAPIMEX. *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results, Notice of Intent To Rescind, in Part, and Final Rescission, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 24,583 (Dep't Commerce June 11, 2025) ("*Preliminary Results*"), P.R. 84. Commerce's preliminary determination found that STAPIMEX had failed to provide information requested by the agency regarding the company's market economy brokerage and handling expenses that should have been reported in the DMEBROKU field of its Section C (i.e., U.S. sales) database. *See* PDM at 6-7 (discussing application of facts available and use of adverse inferences), P.R. 85.

As explained by Commerce in the preliminary results, because STAPIMEX failed to include requested brokerage and handling expense information in its initial U.S. sales database, the agency issued the respondent a supplemental questionnaire where it "specifically asked STAPIMEX to clarify whether it 'incurred DMEBROKU expenses in a market economy country,' {and} to revise its U.S. sales database to report this expense accordingly." PDM at 7 (quoting Letter from Commerce to STAPIMEX, re: *Supplemental Section C Questionnaire* (Mar. 7, 2025) ("Suppl. Sec. C Questionnaire"), C.R. 133, P.R. 116), P.R. 85.[5] Despite asking

[5] As noted in footnote 1 above, Plaintiff's brief incorrectly identifies the date of Commerce's supplemental section C questionnaire as March 27th. Pl. Br. 14 (stating that "Commerce issued a supplemental Section C questionnaire on March 27, 2025"). Contrary to Plaintiff's statement, Commerce's supplemental section C questionnaire was issued on March 7th with a response deadline of March 17th. *See* Suppl. Sec. C Questionnaire at 2, C.R. 133, P.R. 116. The business day before the response deadline, STAPIMEX requested a one-week extension of time stating that "while Stapimex is diligently preparing its response, it simply needs more time." Letter from STAPIMEX to Commerce, re: *STAPIMEX Request for Extension of Time to Respond to Supplemental Section C Questionnaire* (Mar. 14, 2025), P.R. 115. Commerce did not respond to STAPIMEX's extension request before the deadline expired and STAPIMEX did not submit its response until a full-week after the deadline set by the agency had

STAPIMEX to report its brokerage and handling expenses a second time, the respondent "again failed to include the DMEBROKU field reporting per-unit expenses for each sale in its U.S. sales database." *Id.* Commerce therefore found in the preliminary results that the use of partial facts available with an adverse inference was warranted with respect to the market economy brokerage and handling expense information that STAPIMEX failed to report in its U.S. sales database. *Id.* at 8.

More than ten days after Commerce's preliminary decision was released, STAPIMEX filed a letter concerning "an error" committed by STAPIMEX in responding to one of the agency's supplemental questionnaires. *See* Letter from STAPIMEX to Commerce, re: *Error in Response to Supplemental Section C Questionnaire* (June 16, 2025) ("STAPIMEX Error Letter"), C.R. 40, P.R. 73. STAPIMEX claimed in this letter that the company's revised U.S. sales database failed to report requested brokerage and handling expenses in the DMEBROKU field "due to an error by its independent computer consultant." *Id.* Though the deadline for the submission of new factual information had expired, STAPIMEX sought permission to "file the correct supplemental Section C database." *Id.*

On July 11, 2025, Commerce denied STAPIMEX's request to submit another revised Section C sales database and cancelled in-person verification of the company's questionnaire responses. Letter from Commerce to STAPIMEX, re: *Denial of Request to Re-Submit Section C Questionnaire Response and Cancellation of Soc Trang Seafood Joint Stock Company Verification* (July 11, 2025) ("Denial of Request to Submit Revised U.S. Sales Database"),

---

passed. *See* Letter from Commerce to STAPIMEX, re: *Response to Request for Reconsideration* (May 13, 2025), P.R. 99. Despite STAPIMEX's failure to meet Commerce's deadlines, the agency allowed the respondent to resubmit its response to Commerce's supplemental section C questionnaire out-of-time. *Id.* (allowing STAPIMEX to resubmit its response to Commerce's supplemental section C questionnaire "unchanged from its original submission").

P.R. 68. In denying STAPIMEX's request to submit a revised U.S. sales database out-of-time, Commerce stated that "a new U.S. sales database would constitute new factual information concerning STAPIMEX's supplemental questionnaire response, the contents of which were not requested." *Id.* at 2. Commerce also addressed STAPIMEX's claim that an "independent computer consultant" was to blame for the continued omission of requested brokerage and handling information. *Id.* Specifically, Commerce stated that "the company and its U.S. counsel are responsible for the accuracy of its submissions" and that STAPIMEX had "ample opportunity" prior to the deadline for the preliminary results to notify Commerce of the error with the U.S. sales file submitted with its supplemental response. *Id.*

Following Commerce's decision to cancel verification, STAPIMEX submitted a letter requesting that Commerce "reinstate verification," *see* Letter from STAPIMEX to Commerce, re: *STAPIMEX Request that Commerce Reinstate Verification* (July 16, 2025), P.R. 65, and sought a meeting with the Acting Deputy Secretary. Letter from STAPIMEX to Commerce, re: *Request for Meeting with Acting DAS* (Aug. 4, 2025), P.R. 59. Commerce granted STAPIMEX's request for a meeting and held an *ex parte* meeting with counsel to STAPIMEX discussing the respondent's request to "reinstate" the cancelled verification. Memorandum to The File, re: *Ex Parte Meeting* (Aug. 14, 2025), P.R. 58.

After evaluating STAPIMEX's request, Commerce declined to reinstate the verification of the respondent's questionnaire responses. Letter from Commerce to STAPIMEX, re: *Response to Request to Reinstate Verification of Soc Trang Seafood Joint Stock Company Verification* (Aug. 26, 2025), P.R. 56. In denying STAPIMEX's request, Commerce explained that both the respondent's U.S. sales and FOP databases are unverifiable due to STAPIMEX's

failure to report brokerage expenses and its failure to report its FOPs on a CONNUM-specific basis. *Id.* at 2.

STAPIMEX filed a case brief on November 15, 2025. Letter from STAPIMEX to Commerce, re: *STAPIMEX Case Brief* (Nov. 14, 2025) ("STAPIMEX Case Brief"), C.R. 6, P.R. 34. STAPIMEX's case brief argued that Commerce should rely on the brokerage expense information "submitted by STAPIMEX on June 20, 2025."[6] *Id.* at 3. STAPMIEX also argued that Commerce should decline to use an adverse inference in selecting from the facts otherwise available because "Commerce cannot use statutory deadlines as an excuse to not calculate dumping margins as accurately as possible" and because "the public interest requires the right result." *Id.* at 10-11 (citation omitted). AHSTAC and the American Shrimp Processors Association ("ASPA") filed responses to STAPIMEX's case brief. *See* Letter from AHSTAC to Commerce, re: *Rebuttal Brief* (Dec. 9, 2025), P.R. 19; Letter from ASPA to Commerce, re: *American Shrimp Processors Association's Rebuttal Brief* (Dec. 9, 2025), C.R. 4, P.R. 17.

Commerce issued the final results on February 17, 2026. *See* IDM at 1, P.R. 10. In the final results, Commerce decided to apply "total AFA" in determining the weighted-average dumping margin for STAPIMEX. *Id.* at 9. Commerce reached this determination after concluding that "errors in both {STAPMIEX's} Section C and D databases . . . rendered the databases unverifiable and therefore unusable." *Id.* at Comment 4. As a result, STAPIMEX was assigned the Vietnam-wide entity dumping margin of 25.76 percent. *Final Results*, 91 Fed. Reg. at 8,430.

---

[6] As discussed above, this U.S. sales information was rejected from the record by Commerce as untimely. *See* Denial of Request to Submit Revised U.S. Sales Database at 1, P.R. 68. Despite this agency action being explicitly identified as one of the two counts in Plaintiff's complaint (*see* ECF 1-1), STAPIMEX does not challenge Commerce's rejection of this information in its brief to this Court.

## STANDARD OF REVIEW

In reviewing Commerce's determinations in administrative reviews of antidumping duty orders, the Court will only "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1). A decision is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). Under the substantial evidence standard, the question is not whether the court would have reached the same decision on the same record. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). Rather, it is whether the administrative record as a whole permits the agency's conclusion. *See Dongkuk S&C Co. v. United States*, 134 F.4th 1320, 1331 (Fed. Cir. 2025) ("Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence." (citation omitted)).

## ARGUMENT

### I. <u>Commerce's Application of Total Adverse Facts Available to STAPIMEX Is Supported by Substantial Evidence and In Accordance with Law</u>

STAPIMEX argues that Commerce's application of total AFA is not supported by substantial evidence on the record and is otherwise contrary to law. *See* Pl. Br. at 37-38. Specifically, STAPIMEX claims that it responded "precisely" to Commerce's questionnaire and "fully complied" with the agency's requests for information. *Id.* at 24-25. STAPIMEX further

contends that Commerce's decision to assign the respondent a margin using total AFA violated the agency's obligation to calculate dumping margins as accurately as possible and resulted in a dumping margin that was unduly punitive.[7] *Id.* at 19-20 (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). However, as detailed below, Commerce reasonably determined that necessary information was missing from the record and that STAPIMEX failed to act to the best of its ability in responding to requests from Commerce. Accordingly, Commerce's decision to use facts otherwise available under section 776(a) of the Tariff Act of 1930, as amended (the "Act"), as well as its subsequent application of an adverse inference in selecting from among the facts otherwise available, was supported by substantial evidence and in accordance with law.

### A. Legal Standard Governing Commerce's Use of Facts Available and Adverse Inferences

Section 776 of the Act establishes a two-step framework governing Commerce's use of facts otherwise available and adverse inferences. *See* 19 U.S.C. § 1677e. First, Commerce must use facts otherwise available if an interested party: (i) withholds information that has been requested, (ii) fails to provide information requested by the deadlines for submission of the information or in the form and manner requested, (iii) "significantly impedes a proceeding," or (iv) provides information that cannot be verified. *Id.* § 1677e(a)(2). Second, Commerce may apply an adverse inference in selecting from among the facts otherwise available when it finds

[7] The dumping margin assigned to STAPMIEX in the final results, i.e., 25.76 percent, determined on the basis of "total AFA" was less than the 35.29 percent margin calculated in the preliminary results largely using the information provided by STAPIMEX. *Compare Final Results*, 91 Fed. Reg. 8,430, *with Preliminary Results*, 90 Fed. Reg. at 24,585. Commerce rejected arguments presented by ASPA to apply the preliminary rate of 35.29 percent as the AFA rate and instead maintained the Vietnam-wide entity rate determined in the underlying less-than-fair-value investigation. IDM at 48, P.R. 10.

that an interested party "failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1). Thus, the statute requires that the record must support both a finding that the use of facts available is warranted and the additional finding that an adverse inference is warranted. *See*, *e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Steel*") (explaining the distinction between the two sections of section 776 of the Act).

The Federal Circuit explained in *Nippon Steel* that the "adverse inference" analysis of subsection (b) focuses on the respondent's "failure to cooperate to the best of its ability, not its failure to provide requested information." *Nippon Steel*, 337 F.3d at 1381 (emphasis omitted). For Commerce to conclude that a respondent failed to cooperate "to the best of its ability" such that an adverse inference is appropriate, the agency considers whether the respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id.* Although the standard "does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* Finally, Commerce need not establish intentional misconduct because the statutory standard turns on the respondent's efforts to comply, "regardless of motivation or intent." *Id.* at 1383.

**B. Substantial Evidence Supports Commerce's Application of Facts Otherwise Available with an Adverse Inference**

1. <u>STAPIMEX's Arguments Fail to Engage with the *Final Results*</u>

It is beyond cavil that this Court reviews final determinations. 19 U.S.C. § 1516a(a)(2)(B). Despite this, STAPIMEX's memorandum in support of its motion for judgment on the agency record largely ignores the sixty-five pages of analysis provided in the IDM. *See* Pl. Br. *passim* (providing no citations to the IDM in the argument section of its brief).

Instead of presenting arguments contesting the factual findings and explanations made in the final results, STAPIMEX presents to the Court the same arguments—in largely the same form—as those presented in its agency case brief. *Compare* Pl. Br. at *passim*, *with* STAPIMEX Case Brief at *passim*, C.R. 6, P.R. 34. For example, STAPIMEX argued in its agency case brief that it "did not manipulate its product code or CONNUM data in its Section C database." STAPIMEX Case Brief at 17, C.R. 6, P.R. 34. This same argument appears verbatim in STAPIMEX's brief to the Court, *see* Pl. Br. 31, and fails to engage (or even acknowledge) Commerce's discussion of this issue in the IDM. *See* IDM at 44 ("Regarding STAPIMEX's claim that it did not manipulate product codes and CONNUMs in the Section C database, again STAPIMEX is defending parts of its response that Commerce is not questioning."), P.R. 10. Thus, as it did at the agency level, Plaintiff fails to present any comprehensible legal or factual argument but instead asks this Court (and other parties to this litigation) to "wade through overly complicated submissions that do not conform with the narrative explanations provided" and spend significant time and resources "unwrapping basic information." *See id.* at 48. However, because Plaintiff failed to develop arguments based on the explanation provided in the final results, the Court should find that the arguments not sufficiently developed are waived.

2. <u>Commerce Reasonably Determined that Information Necessary to Calculating a Dumping Margin Was Missing from the Record</u>

In accordance with the statute, Commerce first determined whether the use of facts available was warranted. *See* IDM at 28-48, P.R. 10. Specifically, after the preliminary results, Commerce was notified as to errors in both STAPIMEX's sections C and D databases. *Id.* at 37 (citing STAPIMEX Error Letter at 2, 8-9, C.R. 40, P.R. 73). These errors included the submission of an incorrect U.S. sales database that failed to report requested brokerage expense

information and an FOP database that did not report FOPs on a CONNUM-specific basis. *Id.* STAPIMEX's arguments challenging Commerce's determination are unpersuasive.

According to STAPIMEX, the record shows that the respondent cooperated and "made only one mistake" with respect to its reporting of U.S. brokerage and handling expense information. Pl. Br. 19. The IDM, however, details STAPIMEX's repeated failures to report U.S. brokerage expense information despite multiple requests for that information made by Commerce.

STAPIMEX admits in its brief that its initial U.S. sales database failed to provide requested market economy brokerage and handling expense information. Pl. Br. 14 (confessing that STAPIMEX "did not include DMEBROKU in its Section C database"). Based on STAPIMEX's failure to properly report U.S. brokerage and handling expense in its initial response, Commerce issued STAPIMEX a supplemental questionnaire. Suppl. Sec. C Questionnaire at 6-7, C.R. 133, P.R. 116. This supplemental questionnaire noted that STAPIMEX failed to include the "DMEBROKU field in {its} U.S. sales database" despite the company incurring such expenses and asked the company to revise its U.S. sales database accordingly. *Id.* at 6. Specifically, the questions regarding STAPIMEX's reporting of U.S. brokerage and handling in Commerce's supplemental questionnaire appear below:

> 10. On page 33-34 (pdf page 40-41) of your CQR, for field number 20.1: market economy brokerage and handling expenses (DMEBROKU), you reported that for each DDP sale, Stapimex paid brokerage and handling expenses through U.S. customs brokers. However, you have not reported a DMEBROKU field in your U.S. sales database. Further, the instructions for this field state that you should report the per-unit expense for brokerage and handling charges incurred in a market economy (ME) location, such as Hong Kong, for sales to the United States.
>
> a. Please clarify whether Stapimex incurred DMEBROKU expenses in a market economy country and revise your section C database accordingly. Otherwise, please affirmatively state that Stapimex did not incur DMEBROKU expenses.
>
> b. If Stapimex did incur DMEBROKU expenses, please provide a chart which identifies each country in which these expenses occurred.
>
> [10] Note: the page numbers of the CQR stop after page 31.
>
> Filed By: robert palmer, Filed Date: 3/7/25 11:15 AM, Submission Status: Approved
>
> Barcode: 4727611-01 A-552-802 REV - Admin Review 2/1/23 - 1/31/24
>
> c. For invoices [ ], please provide documentation demonstrating that Stapimex paid DMEBROKU expenses, including the customs broker invoices and documentation that these invoices were paid in a ME currency.

Source: Letter from Commerce to STAPIMEX, re: *Supplemental Section C Questionnaire* (Mar. 7, 2025), C.R. 133, P.R. 116.

Despite Commerce's second request for this information, STAPIMEX again failed to report market brokerage and handling expenses in the DMEBROKU field of its revised U.S. sales database.[8] *See* STAPIMEX Error Letter at 2, C.R. 40, P.R. 73. Thus, Commerce's finding in the final results that STAPIMEX failed to provide U.S. brokerage and handling expense information requested by the agency is supported by substantial evidence.

Commerce's decision to use facts available was also the result of its factual finding that STAPIMEX's FOP database could not be verified. IDM at 38, P.R. 10. As noted by Commerce, in NME proceedings such as this one, the agency requires that respondents provide "CONNUM-specific FOPs to construct the value of the product sold, 'to ensure that a fair comparison is made

[8] As STAPIMEX admits, it never responded to Question 10(c), as this question was "unknowingly 'lost.'" Pl. Br. 15-16. According to the Plaintiff, this question is believed to have "evaporated" converting between PDF and Word. *Id.*

between the U.S. price and normal value.'" IDM at 41 (quoting *Thuan An Production Trading & Service Co. v. United States*, 348 F. Supp. 3d 1340, 1353 (Ct. Int'l Trade 2018)), P.R. 10. This is done because similar products may have different physical characteristics despite falling within the same antidumping duty order and CONNUM-specific FOP reporting allows Commerce to accurately compare weighted-average normal values for each CONNUM in the FOP database to the corresponding weighted average U.S. price for that CONNUM. *Id.*

As detailed in the IDM, STAPIMEX's section D database failed to provide CONNUM-specific FOP data. IDM at 41-46, P.R. 10. Specifically, Commerce noted that, following the preliminary results, it learned that STAPIMEX misstated how it reported its FOP data and that this data was not reported on a CONNUM-specific basis, as requested by the agency. *Id.* at 42. Instead of reporting a single unique FOP for each CONNUM, STAPIMEX's database listed the same CONNUM multiple times with different FOPs. *Id.* Commerce further analyzed the deficiencies in STAPIMEX's FOP database in a memorandum accompanying the final results. *See* Memorandum to The File, re: *STAPIMEX's FOP Database* (Feb. 17, 2026), C.R. 3, P.R. 8. This memorandum, which was not cited in Plaintiff's opening brief, provided a detailed analysis of the deficiencies in STAPIMEX's FOP database and further explained Commerce's conclusion that STAPIMEX failed to report its FOPs on a CONNUM-specific basis. *Id.*

Commerce observed in this memorandum instances of the same product code appearing with different CONNUMs attached to it. *Id.* at 1. The agency also observed instances of a repeated CONNUM corresponding to different product codes. *Id.* at 2. Thus, Commerce supported its factual finding that STAPIMEX did not report its FOP data in the manner requested by the agency.

STAPIMEX challenges individually the two bases that underpin Commerce's application of total AFA. Specifically, in summarizing the issues of law presented, STAPIMEX argues that neither its failure to report per-unit customs brokerage expenses in the U.S. sales database nor its failure to report its FOPs on a CONNUM-specific basis warrant Commerce applying total AFA. Pl. Br. 2-3.[9] However, Commerce's determination to apply total AFA is required by statute to be based on the "case as a whole." *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1367-68 (Ct. Int'l Trade 2020). Here, Commerce determined that it was appropriate to apply total AFA to STAPIMEX after discovering errors in both its Section C and D databases that rendered the data unverifiable. IDM at 37, P.R. 10. Thus, Commerce's decision to apply total AFA must be reviewed in light of Commerce's factual finding that STAPIMEX's reporting was "so incomplete" that it could not serve as a reliable basis for calculating a dumping margin. *Id.*

STAPIMEX is also incorrect in arguing that Commerce failed to comply with section 782(d) of the Act by not providing STAPIMEX an opportunity to remedy its deficient FOP reporting. Pl. Br. 34 ("Commerce did not meet it {sic} burden under 19 U.S.C. § 1677m(d)."); *see also id.* at 10 ("Commerce must ask a question twice and have it go unanswered prior to finding a party did not perform to the best of its ability . . . ."). Here, Commerce only learned of STAPIMEX's failure to report its FOPs on a CONNUM-specific basis after the preliminary results. IDM at 44, P.R. 10. Because the agency did not know STAPIMEX's FOP database was

[9] Plaintiff's confusion regarding Commerce's determination is demonstrated by STAPIMEX's repeated claim that Commerce relied on a per-unit brokerage expense amount of $0.76 per pound. *See, e.g.*, Pl. Br. 3 (claiming that Commerce's use of this amount "is certainly punitive compared to the actual customs brokerage" expenses); *id.* at 5 (claiming that Commerce used $0.76 per pound "as total AFA"); *id.* at 21-22 (identifying $0.76 as "punitive by any measure"). However, Commerce did not conduct any such gap-filling in the final results. Instead, Commerce assigned STAPIMEX a rate based entirely on AFA after concluding that "it would be inappropriate for Commerce to rely on a rate derived from unreliable, unverified information for use as AFA in this instance." IDM at 48, P.R. 10.

not CONNUM-specific, it was not required to ask STAPIMEX to confirm that it had actually reported its FOP databases as requested. *See*, *e.g.*, *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018) ("Commerce is not obligated to issue a supplemental questionnaire to the effect of, 'Are you sure?'").

3. Commerce Reasonably Concluded that STAPIMEX Failed to Cooperate by Not Acting to the Best of Its Ability

Commerce's IDM detailed the agency's decision to apply total AFA. IDM at 30-34, 46-48, P.R. 10. The agency found that STAPIMEX's failure to report U.S. brokerage and handling expense in the DMEBROKU field was "not merely clerical" but the "result of inattention and carelessness." *Id.* at 33. Indeed, STAPIMEX continued to provide requested information even after "Commerce explicitly informed {the company} in a supplemental questionnaire that it had failed to provide the requested per-unit expenses." *Id.* The IDM also presented other instances of inattentiveness and carelessness that supported the conclusion that STAPIMEX failed to cooperate by not acting to the best of its ability. *Id.* at 47. This included the inclusion of "superfluous information" that needlessly complicated the company's FOP database. *Id.* Moreover, Commerce was unable to follow the variable names in STAPIMEX's FOP database because of a "grossly incomplete summary sheet." *Id.* While STAPIMEX provided the full names of the FOPs in response to a deficiency questionnaire, the FOP database listed "different shorter FOP variable names." *Id.* at 48. Thus, Commerce found that "{t}his lack of clarity in its main exhibits shows a lack of effort to present careful data to Commerce and demonstrates carelessness and inattentiveness." *Id.*

STAPIMEX contends that Commerce "abused its discretion" by finding that STAPIMEX did not act to the best of its ability. Pl. Br. 35-36. It further argues that it "fully advised" Commerce how the company reported its CONNUMS and product codes. *Id.* at 38. Here again,

STAPIMEX's argument is divorced from the facts. Commerce noted in the IDM that STAPIMEX claimed to have reported "FOPs as requested" in its narrative response to section D of the questionnaire. IDM at 42 (citation omitted), P.R. 10. Thus, Commerce believed that STAPIMEX reported its FOPs on a CONNUM-specific basis, as instructed, until after the preliminary results. Thus, Commerce supported its determination that STAPIMEX failed to cooperate by not acting to the best of its ability.

4. Commerce's Selection of the 25.76 Percent AFA Rate Is in Accordance with Law

STAPIMEX argues that Commerce overlooked "the over-riding principle" that dumping margins be calculated "as accurately as possible." Pl. Br. 19-20. According to STAPIMEX, "the antidumping laws are remedial not punitive" and Commerce's failure to calculate dumping margins as accurately as possible is an abuse of discretion. *Id.* STAPIMEX's arguments are without merit.

STAPIMEX misapplies Federal Circuit case law when it states that dumping margins must be "calculated as accurately as possible." *See*, *e.g.*, Pl. Br. 8 (citing *Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001)). In *Nan Ya*, the Federal Circuit explained that a determination is "accurate" if it is correct as a mathematical and factual matter. 810 F.3d 1333, 1344 (Fed. Cir. 2016). Indeed, describing its body of case law, the Federal Circuit stated in *Nan Ya* that "a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Id.* (citations omitted); *see also Dillinger France S.A. v. United States*, 651 F. Supp. 3d 1294, 1319 (Ct. Int'l Trade 2023) ("But the Federal Circuit has established that a

determination by Commerce is 'accurate' if it is correct as a mathematical and factual matter, {and} thus supported by substantial evidence." (internal quotation marks omitted)).

STAPIMEX fails to identify any mathematical errors in the Vietnam-wide entity rate assigned to the company in the final results—a rate that was calculated more than 20-years ago and applied consistently to companies considered to be part of the Vietnam-wide entity. Moreover, STAPIMEX's argument regarding the supposed "punitive" nature of the assigned AFA rate is also without merit. *See* Pl. Br. 6 (stating, without any citation, that "{t}he courts have consistently observed that excessive, punitive duties are not justified since the primary duty of Commerce in calculating dumping duties is to be as accurate as possible, albeit with some penalty when data is not submitted in the form requested"). As noted by Commerce in the final results, the AFA rate applied to STAPIMEX was taken from the final determination in the less-than-fair value investigation. IDM at 13, P.R. 10. Pursuant to section 776(c)(2) of the Act, Commerce "shall not be required to corroborate any dumping margin or countervailing duty applied in a separate segment of the same proceeding." 19 U.S.C. § 1677e(c)(2). Thus, because the AFA rate assigned to STAPIMEX was determined consistent with the statutory requirements, it is not punitive. *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (holding that "an AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure").

## II. The Court Should Decline to Consider STAPIMEX's Arguments Regarding Commerce's Preliminary Margin Program

Finally, Plaintiff alleges that Commerce made three calculation errors in its preliminary determination and claims that Commerce is "required to correct its mistakes."[10] Pl. Br. 40; *see*

[10] This section of Plaintiff's brief has the heading "Commerce made errors in its calculations in the preliminary results. They should be corrected in the final results." Pl. Br. 39 (capitalization altered). Section 516A of the Tariff Act makes clear however that the Court

*also id.* at 6 (arguing that "Commerce made several errors in its calculations performed for the preliminary results" and claiming, without any supporting citation, that "courts have held that such errors should be corrected"). Specifically, Plaintiff argues that Commerce's preliminary determination: (1) used an incorrect surrogate to value fresh raw shrimp; (2) relied on an unreasonable surrogate value in calculating the larvae input cost; and (3) erred in computing frozen shrimp input cost. *Id.* at 39-40. As explained below, these arguments must be rejected as they overlook Commerce's decision in the final results—the actual agency determination under review—to assign STAPIMEX a rate based entirely on AFA.

### A. Relevant Factual Background

In its preliminary determination, Commerce calculated an estimated weighted-average dumping margin of 35.29 percent for STAPIMEX using information provided by the company in response to Commerce's initial and supplemental questionnaires. *See Preliminary Results*, 90 Fed. Reg. at 24,585, P.R. 84. Consistent with its regular NME methodology, Commerce calculated normal value based on the FOPs reported by the company. *See* Commerce Memorandum, re: *Surrogate Values for the Preliminary Results* (June 5, 2025), C.R. 49, P.R. 81.

However, and as described above, Commerce determined in the final results that it was unable to use STAPIMEX's reported data to calculate a dumping margin and that the respondent had failed to cooperate by not acting to the best of its ability to comply with requests for information. IDM at 12, P.R. 10. As a result, Commerce assigned STAPIMEX a dumping

---

reviews "final determination{s}." 19 U.S.C. § 1516(a)(2)(B)(iii). Thus, Plaintiff is wrong in asking the Court to review "other errors" that it believes were made in Commerce's *preliminary* determination. *See* Pl. Br. 39. Domestic Producers also note that this same heading appears nearly verbatim in STAPIMEX's administrative case brief. STAPIMEX Case Brief at 33, C.R. 6, P.R. 34. And the "facts" and "legal argument" presented to this Court are largely unchanged from those presented to Commerce. *Compare* Pl. Br. 39-43, *with* STAPIMEX Case Brief at 33-38, C.R. 6, P.R. 34.

margin in the final results determined in the underlying less-than-fair value investigation. *Id.* at 13 (citing *Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From the Socialist Republic of Vietnam*, 69 Fed. Reg. 71,005, 71,009 (Dep't Commerce Dec. 8, 2004)). Based on its decision to assign STAPIMEX a margin based entirely on AFA, Commerce found that the respondent's arguments regarding alleged errors in the calculation of certain surrogate values in the preliminary results to be "moot." IDM at 49 ("If Commerce were calculating a rate for STAPIMEX, we would have addressed the alleged ministerial errors herein."), P.R. 10.

**B. The Court Should Reject as Moot STAPIMEX's Challenges to Commerce's Preliminary Margin Calculation**

STAPIMEX's brief fails to explain how any errors allegedly made in Commerce's preliminary determination are not moot because of the agency's decision to assign the company a rate based entirely on AFA in the final results. *See* IDM at 49, P.R. 10. As observed by Commerce in the IDM, arguments regarding adjustments to the preliminary margin calculation became moot as a result of the agency's decisions to disregard the information submitted by STAPIMEX and to assign the company a margin based entirely on AFA. *Id.*

The CIT has previously declined to resolve challenges to Commerce's calculation of certain expenses after sustaining Commerce's use of total AFA. For example, in *Deacero S.A.P.I. de C.V. v. United States*, the CIT found arguments regarding the calculation of certain expenses, correction of clerical errors, and use of zeroing when calculating the dumping margin "moot" after sustaining Commerce's application of total AFA. 353 F. Supp. 3d 1303, 1314 (Ct. Int'l Trade 2018) ("The court does not reach Plaintiffs' three remaining challenges, in light of its decision to sustain Commerce's reliance on total AFA to calculate Deacero's dumping margin."). Likewise, in *Kisaan Die Tech Private Limited* the Court concluded that "no relief can be

granted" regarding a claim pertinent to the calculation of U.S. price when the assigned rate was determined using an adverse inference rather than an examination of the respondent's own sales. 665 F. Supp. 3d 1364, 1378 (Ct. Int'l Trade 2023). Similar to those cases, should the Court sustain Commerce's application of total AFA, then it should conclude that the margin calculation issues are moot because they have no bearing on the dumping margin assigned to STAPIMEX.

**CONCLUSION**

For the reasons above, Domestic Producers respectfully request that the Court sustain the *Final Results* and enter judgment in favor of Defendant United States.

Respectfully submitted,

*/s/ Zachary J. Walker*

Zachary J. Walker
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Avenue NW
Suite 700
Washington, DC 20036

*Counsel to Defendant-Intervenor the Ad Hoc Shrimp Trade Action Committee*

Dated: October 22, 2026

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

I, Zachary J. Walker, hereby certify that this brief, exclusive of the table of contents, table of authorities, certifications of counsel, and counsel's signature block, but including headings, footnotes, and quotations contains 6,745 words, according to the word count function of the word processing program used to prepare this brief, and therefore complies with the word limitations as set forth in ¶ 2(B) of the Standard Chambers Procedures of this Court.

*/s/ Zachary J. Walker*
Zachary J. Walker

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Avenue NW
Suite 700
Washington, DC 20036

*Counsel to Defendant-Intervenor the Ad Hoc Shrimp Trade Action Committee*

Dated: October 22, 2026